**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Crim. No. 26-90 |
| | * | |
| RAYMOND CHANDLER III | * | |
| | * | |
| | * | Hon. Christy Criswell Wiegand |
| | * | |

**MOTION TO DISMISS INDICTMENT UNDER THE FIRST AMENDMENT FOR LACK OF A TRUE THREAT**

JAKE MORRISON
Assistant Federal Public Defender
PA I.D. No. 322552
jake_morrison@fd.org

Federal Public Defender
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222-3714
T: 412.644.6565
F: 412.644.4594

*Counsel for Raymond Chandler III*

## TABLE OF CONTENTS

Page

INTRODUCTION ........ 1

BACKGROUND ........ 5

A. A constituent—and candidate—calls his elected representative every day. ........ 5

B. The indictment's "context": trials, votes, and the rule of law ........ 7

C. The five charged voicemails ........ 8

D. What the quotations leave out. ........ 12

E. Procedural history. ........ 13

LEGAL STANDARD ........ 13

ARGUMENT ........ 16

I. THE CHARGED VOICEMAILS ARE POLITICAL HYPERBOLE, NOT TRUE THREATS. ........ 16

A. The First Amendment protects even violent political rhetoric; "true threats" are a narrow exception. ........ 16

B. *Counterman*'s recklessness requirement is an added protection for speakers, not a substitute for an objective true threat. ........ 19

C. The context pled in the indictment marks every charged voicemail as political speech. ........ 22

D. Each charged voicemail is protected speech. ........ 26

1. Count Five: Asking a Member of Congress to shoot the President is a protest, not a threat. ........ 26

2. Count Four: A prediction of violent upheaval or revolution, expressly disavowed, is not a threat. ........ 29

3. Count Two: A defiant dare conditioned on the government building concentration camps is *Watts* all over again. ........ 31

4. Counts One and Three: Advocacy of violent resistance to a federal agency is protected speech. ........ 33

II. THE FIRST AMENDMENT REQUIRES DISMISSAL NOW. ........ 37

A. Americans have always taken their angriest grievances to their representatives—often in violent terms. ........ 37

B. A trial would itself inflict the injury the First Amendment forbids. ........ 41

CONCLUSION ........ 43

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bauer v. Sampson*, 261 F.3d 775 (9th Cir. 2001) .....34

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011) .....22, 37

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984) ..... 15, 41

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) .....17, 28, 33, 34

*Brayshaw v. City of Tallahassee*, 709 F. Supp. 2d 1244 (N.D. Fla. 2010) .....25

*Carey v. Brown*, 447 U.S. 455 (1980) .....17

*Counterman v. Colorado*, 600 U.S. 66 (2023) ..... passim

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) ..... 4, 42

*Elonis v. United States*, 575 U.S. 723 (2015) .....20, 21

*Fogel v. Collins*, 531 F.3d 824 (9th Cir. 2008) .....24, 32, 36

*Garrison v. Louisiana*, 379 U.S. 64 (1964) .....18

*Hess v. Indiana*, 414 U.S. 105 (1973) ..... 17, 33

*Hess v. Oakland Cnty.*, 174 F.4th 981 (6th Cir. 2026) ..... 15, 24, 28, 32

*McCoy v. Stewart*, 282 F.3d 626 (9th Cir. 2002) .....33

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) .....1, 17, 25, 33

*New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184 (2d Cir. 2001) ..... 30

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) .....1

*Noto v. United States*, 367 U.S. 290 (1961) ..... 17, 34

*Nwanguma v. Trump*, 903 F.3d 604 (6th Cir. 2018) .....33

*Osborne v. Ohio*, 495 U.S. 103 (1990) .....18

*Rankin v. McPherson*, 483 U.S. 378 (1987) ..... 17, 18, 26

*Snyder v. Phelps*, 562 U.S. 443 (2011) ..... 42

*Solomon v. Petray*, No. 5:10-cv-05163, 2013 WL 210894 (W.D. Ark. Jan. 18, 2013) .....36

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949) .....18

*United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217 (1967) ..... 22

*United States v. Anten*, 184 F.4th 1115 (9th Cir. 2026) .......... 20

*United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011) .......... 14, 26, 27, 30

*United States v. Barcley*, 452 F.2d 930 (8th Cir. 1971) .......... 24

*United States v. Bergrin*, 650 F.3d 257 (3d Cir. 2011) .......... 13

*United States v. Bly*, 510 F.3d 453 (4th Cir. 2007) .......... 32

*United States v. Cassel*, 408 F.3d 622 (9th Cir. 2005) .......... 30

*United States v. Cook*, 472 F. Supp. 3d 326 (N.D. Miss. 2020) .......... 41

*United States v. Crouse*, No. 1:25-cr-393-RP, ECF 77 (W.D. Tex. Feb. 16, 2026) .......... 14

*United States v. Dutcher*, 851 F.3d 757 (7th Cir. 2017) .......... 17

*United States v. Elonis*, 841 F.3d 589 (3d Cir. 2016) .......... 19, 20

*United States v. Fenton*, 30 F. Supp. 2d 520 (W.D. Pa. 1998) .......... 13, 14, 28, 37

*United States v. Fullmer*, 584 F.3d 132 (3d Cir. 2009) .......... 18, 24

*United States v. Huet*, 665 F.3d 588 (3d Cir. 2012) .......... 13

*United States v. Joudeh*, No. 6:25-cr-290, 2026 WL 2234671 (M.D. Fla. Aug. 1, 2026) .......... 15, 34

*United States v. Kosma*, 951 F.2d 549 (3d Cir. 1991) .......... passim

*United States v. Landham*, 251 F.3d 1072 (6th Cir. 2001) .......... 14, 15, 18

*United States v. Lincoln*, 403 F.3d 703 (9th Cir. 2005) .......... 14, 25, 34

*United States v. Miah*, 120 F.4th 99 (3d Cir. 2024) .......... passim

*United States v. O'Dwyer*, 443 F. App'x 18 (5th Cir. 2011) .......... 14, 32

*United States v. Panarella*, 277 F.3d 678 (3d Cir. 2002) .......... 13

*United States v. Perez*, 43 F.4th 437 (5th Cir. 2022) .......... 16

*United States v. Popa*, 187 F.3d 672 (D.C. Cir. 1999) .......... 22

*United States v. Stock*, 728 F.3d 287 (3d Cir. 2013) .......... passim

*United States v. Turner*, 720 F.3d 411 (2d Cir. 2013) .......... 34

*United States v. White*, 670 F.3d 498 (4th Cir. 2012) .......... passim

*United States v. Williams*, 553 U.S. 285 (2008) .......... 28

*Virginia v. Black*, 538 U.S. 343 (2003) .......... 1, 16, 20

*Watts v. United States*, 394 U.S. 705 (1969) .......... passim

**Constitutional Provisions**

U.S. Const. amend. I .......... 1, 13

**Statutes**

18 U.S.C. § 115 .......... 8, 13, 21

18 U.S.C. § 2381 .......... 23

18 U.S.C. § 2441 .......... 23

**Rules**

Fed. R. Crim. P. 12 .......... 13

Fed. R. Evid. 201 .......... 5

**Other Authorities**

2 Philip S. Foner, *The Life and Writings of Frederick Douglass* (1950) .......... 38

Abraham Lincoln, *First Inaugural Address* (Mar. 4, 1861) .......... 38

Adam Liptak, *John Roberts Condemns Schumer for Saying Justices 'Will Pay the Price' for 'Awful Decisions'*, N.Y. Times (Mar. 4, 2020) .......... 40

Aliza Chasan, *Gen. Milley Says He Has "Appropriate" Safety Measures After Trump Social Media Threat*, CBS News (Sept. 27, 2023) .......... 39

Ana Faguy & Brandon Drenon, *Trump Says He Was 'Not Threatening Death' to Democrats over Video to Troops*, BBC News (Nov. 21, 2025) .......... 39

Andrew Desiderio, *Schumer Walks Back SCOTUS Comments After Roberts Rebuke*, Politico (Mar. 5, 2020) .......... 40

Ben Giles, *Arizona Senate Censures Wendy Rogers for Threats, Calls to Violence*, KJZZ (Mar. 1, 2022) .......... 40

Camila Domonoske, *Trump on Rally Violence: 'Don't Accept Responsibility,' Might Pay Legal Bills*, NPR (Mar. 13, 2016) .......... 39

Colin Campbell, *Donald Trump: 'Knock the Crap Out of' Any Protesters About to Throw Tomatoes*, Bus. Insider (Feb. 1, 2016) .......... 39

Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 20, 2025) .......... 39

Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 17, 2025) .......... 9

Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 22, 2023, 7:59 PM) .......... 39

Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 30, 2022, 6:49 PM) .......... 39

Earl Maltz, *The Trial of Anthony Burns (1854)*, Encyclopedia Virginia (Dec. 7, 2020) .......... 38

Eric Bradner, *Trump Launches Direct Attack on McConnell a Month Out from Midterm Elections*, CNN (Oct. 1, 2022) ....... 39

FEC, Campaign to Elect Raymond Chandler III to U.S. Senate in 2028 (ID C00945790) ....... 6

Frederick Douglass, *Is It Right and Wise to Kill a Kidnapper?*, Frederick Douglass' Paper (June 2, 1854) ....... 38

Frederick Douglass, *Let All Soil Be Free Soil: An Address Delivered in Pittsburgh, Pennsylvania, on 11 August 1852*, Frederick Douglass Papers Project ....... 38

George Chidi, *Republican Arizona Lawmaker Makes Post Calling for Execution of Democratic Congresswoman*, Guardian (Sept. 26, 2025) ....... 40

George Ford Smith, *A Firebrand Scorches Colonial Virginia*, Mises Institute (Sep. 7, 2026) ....... 37

Indictment, *United States v. Comey*, No. 4:26-cr-16, ECF 1 (E.D.N.C. Apr. 28, 2026) ....... 11

Jerod MacDonald-Evoy, *GOP Lawmaker Calls for Dem Congresswoman to Be Executed for Urging Trump Protests*, Ariz. Mirror (Sept. 25, 2025) ....... 40

John F. Kennedy, Address on the First Anniversary of the Alliance for Progress (Mar. 13, 1962) ....... 30

Letter from Thomas Jefferson to William Stephens Smith (Nov. 13, 1787) ....... 37

Martin Luther King Jr., *I Have a Dream*, Address at the March on Washington for Jobs and Freedom (Aug. 28, 1963) ....... 30

Meg Kinnard, *Donald Trump Suggests 'One Rough Hour' of Policing Will End Theft*, AP News (Sept. 30, 2024) ....... 39

Mem. in Supp. of Mot. to Dismiss Indictment for Lack of a True Threat, *United States v. Comey*, No. 4:26-cr-16, ECF 33 (E.D.N.C. July 27, 2026) ....... 11

Olivia Diaz, *Democrat Jay Jones Elected Virginia Attorney General Despite Texts Endorsing Violence*, AP News (Nov. 4, 2025) ....... 40

Phil Stewart & Idrees Ali, *Pentagon Elevates Investigation into Iran School Strike*, Reuters (Mar. 13, 2026) ....... 6

President Donald J. Trump, *Designating Antifa as a Domestic Terrorist Organization*, WhiteHouse.gov (Sept. 22, 2025) ....... 9

Rebecca Shabad, *Schumer Denies Threatening Supreme Court Justices, but Says, 'I Shouldn't Have Used the Words I Did'*, NBC News (Mar. 5, 2020) ....... 40

Robert H. Jackson, *Opening Statement Before the International Military Tribunal* (Nov. 21, 1945) ....... 32, 41

Sam Cabral, *Trump Says Cheney Wouldn't Be 'War Hawk' if 'Guns Are Trained on Her'*, BBC News (Nov. 1, 2024) ....39

Steve Holland, *Trump Says He Wouldn't Mind if Someone Shot Through 'the Fake News' to Get Him*, Reuters (Nov. 3, 2024) ....39

The Declaration of Independence (U.S. 1776) ....37

*The House "Gag Rule,"* History, Art & Archives, U.S. House of Representatives ....37

*Trump Says "I Don't Mind" if Someone Had to Shoot Through Media*, CBS News (Nov. 3, 2024) ....39

Whitney Wild & Rebekah Rless, *Family of Renee Good Sues U.S. Government and Trump Officials over Her Death*, CNN (Oct. 1, 2026) .... 6

William Wirt, *Sketches of the Life and Character of Patrick Henry* (1817) ....37

## INTRODUCTION

Raymond Chandler called his representative almost every day. He began nearly every call the same way: his name, his home address, his zip code. By the spring of 2026, he added one more detail—his Federal Election Commission candidate number. He was running for the Senate himself, he announced. And then he told Elected Official 1 why. He thought immigration agents were killing Americans. He thought the war in Iran was murder. He thought the President was a tyrant and the very rich were headed for a reckoning. And he said it all in the starkest terms he could find: the officials and agents behind those policies should be tried for war crimes and executed, and if the country did not change course, revolution would come.

Some of what Mr. Chandler said is shocking. Much of it is crude. None of it was a crime. The First Amendment does not protect only polite speech, and its protection is at its height when a citizen takes political grievances to his own representative. It protects "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). It protects "political hyperbole," even when the speaker talks about getting the President in his rifle sights. *Watts v. United States*, 394 U.S. 705, 706, 708 (1969). And it protects "mere *advocacy* of the use of force or violence." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982) (emphasis in original). The only speech of this kind the government may punish is a "true threat"—"a serious expression of an intent to commit an act of unlawful violence." *Virginia v. Black*, 538 U.S. 343, 359 (2003); *see also Counterman v. Colorado*, 600 U.S. 66, 74 (2023).

None of the five charged voicemails is a true threat. Read in context, as the Constitution requires, not one conveys a serious intention by Mr. Chandler to hurt anyone. Each falls instead into a category of speech the Supreme Court has held protected.

Count Five asks Elected Official 1—a sitting Member of Congress—to walk into the Oval Office and shoot the President, "as my elected official," because "[t]hat's what I am petitioning you to do with my free speech." Indictment ¶ 14. The charged message ends by daring the government to prosecute Mr. Chandler "because of my voice and what I said." *Id.* That is a protest, not a threat. And it was never communicated to the President or to anyone who might carry it out.

Count Four asks Elected Official 1 to "imagine a scenario" in which "a thousand people" surround the homes of "all the 1200 billionaires in this country" and kill them and their families—Elected Official 1 and his daughter among them—in a revolt against "wealth concentration" that "has gotten so bad in this country." *Id.* at ¶ 12. In the same breath, Mr. Chandler disavowed it: "It's not a future I want, it's not a future I'm advocating for." *Id.* A prediction of a grim future, disavowed by the speaker, is not a true threat.

Count Two, left the day after the President announced that he was designating "ANTIFA" a "MAJOR TERRORIST ORGANIZATION," opens with "I'm a Quaker. I'm a Christian. I practice non-violence and peaceful testimonies" before it builds to a dare: Mr. Chandler is "also antifascist," and if the government puts him "in your fucking concentration camp," he will "come out when I'm done and build the gallows and come and hang you." Indictment ¶ 8. A threat conditioned on the government imprisoning political dissenters in concentration camps is *Watts* all over again. And the context the government pled here shows that the gallows reflected Mr. Chandler's demand that officials he viewed as complicit in treason be tried and executed, not a desire to kill anyone himself. He tied that vivid imagery to his grandfather, "who built the gallows that hung Nazi war, war criminals after World War II," and he told Elected Official 1 he would

hang those responsible "after we convict them, after we try them." *Id.* "Get this President out of office today," he concluded. *Id.*

Counts One and Three are advocacy—"I support armed resistance against ICE," "I'm going to start advocating for people to kill them"—aimed at a federal agency and delivered to a legislator. *Id.* at ¶ 6. Even Count One's boldest line carries a *Watts*-style condition: "I am willing to personally kill. If you are willing to arm me, let's go to war." *Id.* And the same voicemail calls for ICE agents to be identified "so that we can try them in a court of law" and "get justice for the people who have died at these monsters' hands." *Id.* That is exactly the speech *Brandenburg* and *Claiborne Hardware* protect.

All of this comes from the indictment itself. The government pled not just the five charged voicemails but eleven more, as context—and that context is fatal to its case. In the indictment's own words, Mr. Chandler was "running" for elected office. He was "coming to Congress" to "try," "prosecute," and "convict" those responsible for what he viewed as war crimes. He would see officials complicit in those crimes "brought to justice" "through the rule of law." He would "destroy their lives in every legal way imaginable." And he was "a Quaker" who "practice[s] non-violence." Indictment ¶¶ 4(e), (g)–(i), (k), 8. A reasonable listener would hear a furious, provocative, and at times deeply uncivil political candidate—not a man announcing that he was about to commit an act of violence himself. And where the indictment's quotations stop, the government's own recordings keep going, often to say exactly what the government left out: "This is an opinion. It's not a threat." "I'm threatening legal process. I'm threatening trials after I'm given the power and the authority to do it[.]" "I am going to try and convict the people who caused these murders . . . . I am going to run on this." *See infra* Background, Part D.

Nor can the government fill the gap with conclusory allegations about what Mr. Chandler knew or intended. *Counterman*'s recklessness requirement is an added protection for speakers, not a substitute for a true threat. It comes into play only after the government shows that the words themselves cross the line—and these words do not.

None of this vocabulary is new. Tyrants, treason, gallows, and the deaths of those in power have always been part of American political speech—from Frederick Douglass's declaration, in this city, that "[t]he only way to make the Fugitive Slave Law a dead letter is to make half a dozen or more dead kidnappers," to President Trump's November 2025 post that six Members of Congress had engaged in "SEDITIOUS BEHAVIOR, punishable by DEATH!" *See infra* Part II.A. None of those speakers was prosecuted. The First Amendment does not protect such words less when they come from a constituent and are aimed up the chain of power rather than down.

Because no reasonable jury, properly instructed in First Amendment law, could find that Mr. Chandler's voicemails are true threats, the Court should dismiss the indictment now. *United States v. Stock*, 728 F.3d 287, 298 (3d Cir. 2013). Waiting for trial would not cure the constitutional injury; it would inflict more of it. "[T]he chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965). And that is especially true because Mr. Chandler has already been imprisoned for months because of these charges. In the last charged voicemail, he asked Elected Official 1 whether the government would come after him "because of my voice and what I said." Within days, it did. The First Amendment forbids exactly that.

## BACKGROUND

The facts below come from the indictment, which the Court accepts as true for purposes of this motion, supplemented by matters of public record.[1] Where the government's recordings continue past the point at which the indictment's quotations stop, Part D notes what they say.

### A. A constituent—and candidate—calls his elected representative every day.

Mr. Chandler lives in Allegheny County. Indictment ¶ 1. After the 2025 inauguration, he "repeatedly called Members of Congress and left voicemails related to his disagreements with immigration enforcement actions, armed conflicts, and wealth inequality." *Id.* ¶ 4. "Repeatedly" undersells it. "I am calling you every day," he told Elected Official 1 in January 2026, "[s]o by this point you should know who I am." *Id.* ¶ 4(e). By April he was opening with, "You've probably getting quite used to my voice." *Id.* ¶ 14. Indeed, as the indictment alludes to, Mr. Chandler left far more voicemails during this period than the sixteen quoted in the indictment, and he left them for more than one elected official. *See id.* ¶ 4. Those messages consistently expressed his views on policies or politics or world events. And, as the government's case agent swore, in the voicemails provided to the FBI, Mr. Chandler always "beg[an] by identifying his name and address." Aff. in Supp. of Crim. Compl. ¶ 13, ECF 3-1 ("Compl. Aff.").

Mr. Chandler was not just a constituent. He was a candidate. On April 1, 2026, he filed a Statement of Candidacy with the Federal Election Commission to run for the United States Senate from Pennsylvania in 2028, as a Democrat. See FEC, Campaign to Elect Raymond Chandler III to

---

[1] The Court may take judicial notice of facts "not subject to reasonable dispute" that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The public events described here supply background only. The motion rests on the indictment.

U.S. Senate in 2028 (ID C00945790). And he put great effort into his campaign, consulting with a lawyer, submitting FEC filings, making campaign merchandise and a website, and spending hours each week going door-to-door in his community asking voters for their support.






*Mr. Chandler's campaign business cards and a YouTube video announcing his candidacy*

"[T]he reason I'm running . . . sir," he told Elected Official 1 days later, "is because I do not support what ICE is doing. I do not support this war in Iran. I do not support the genocide that we fund." Indictment ¶ 4(g).

His calls tracked the news. On January 7, 2026, an ICE officer shot and killed Renee Good, a 37-year-old mother of three, in Minneapolis.[2] On February 28, 2026, the United States and Israel launched strikes on Iran. That day, a missile struck a girls' school in Minab, killing 168 children; a U.S. military investigation reportedly found that U.S. forces were likely responsible.[3] Mr. Chandler's voicemails answered these events in real time: "You started attacking American

2 See Whitney Wild & Rebekah Rless, *Family of Renee Good Sues U.S. Government and Trump Officials over Her Death*, CNN (Oct. 1, 2026).

3 *See* Phil Stewart & Idrees Ali, *Pentagon Elevates Investigation into Iran School Strike*, Reuters (Mar. 13, 2026).

citizens, you started killing people," Indictment ¶ 10; "We didn't mean to bomb that school filled with children," *id.* ¶ 4(i); "school bombings in Iran that murder 150 kids." *id.* ¶ 4(j).

His vocabulary was as much religious as political. He accused officials of breaking "your covenant with God." *Id.* ¶ 4(c). He warned Elected Official 1 that "God's counting every single one. He's counting every single kid you kill." *Id.* ¶ 4(j). He signed off, "May God bless you. May God bless this, this country. Turn to God." *Id.* ¶ 4(c). And he described himself as "a Quaker" and "a Christian" who "practice[s] non-violence and peaceful testimonies." *Id.* ¶ 8. The government's own case agent acknowledged this side of the record. He swore in the criminal complaint that "at times, CHANDLER communicates that acts of violence are against his religion, that he is not advocating for violence"—though he added his view that such statements were "inconsistent with the context and content of the other voicemails." Compl. Aff. ¶ 14 n.1.

**B. The indictment's "context": trials, votes, and the rule of law.**

The indictment does not stop at the five charged voicemails. Its "General Allegations" quote eleven more, "[f]or example." Indictment ¶ 4.[4] The government evidently offers them as context. They are. Alongside the rhetoric the government highlights, they show a man who returned again and again to legal process—arrests, trials, convictions, votes:

> June 10, 2025: "You must arrest the President. You must impeach him. You must convict him, and you must kill him for tyranny and treason." *Id.* ¶ 4(c).
>
> January 12, 2026: "I'm going to destroy their lives in every legal way imaginable and open to me. . . . There is no statute of limitations on murder. I will call for their justice, for their conviction for these

[4] Paragraph 4 has twelve subparagraphs, but paragraph 4(b) repeats the end of the Count One voicemail. *Compare* Indictment ¶ 4(b), *with id.* ¶ 6.

> murders until the day I die. I will vote in that way until the day I die." *Id.* ¶ 4(e).
>
> April 6, 2026: "I do want to provide a little bit of clarification when I say I'm coming to Congress to convict, try, execute, and kill people. I am going to try for war crimes, sir. I'm going to prosecute everyone . . . . I'm going to hold them on a world stage, sir, and then after we convict them, after we try them, I'm going to kill them. I'm going to hang them." *Id.* ¶ 4(h).
>
> April 7, 2026: "If you commit war crimes, I will come to Congress and I will prosecute you for those crimes. I will try you. I will convict you, and I will hang you." *Id.* ¶ 4(i).
>
> April 18, 2026: "We will prosecute you. We will come for you. We will hang you. We will, I will do it myself, okay? It'll be through the rule of law, but you will be brought to justice." *Id.* ¶ 4(k).

The one passage referencing weapons is of a piece. In April 2025, Mr. Chandler told Elected Official 1 that he had bought a combat knife and a dagger, "and it's not because I want to do any harm to anyone. It's not because I wanna do harm to anyone, it's because I'm terrified for my life and terrified that my government's gonna kill me." *Id.* ¶ 4(a).

**C. The five charged voicemails.**

Each count charges a single voicemail that, according to the indictment, Mr. Chandler left for Elected Official 1. Each alleges a violation of 18 U.S.C. §§ 115(a)(1)(B) and 115(b)(4), and Count Four adds § 115(a)(1)(A). The indictment quotes each voicemail "or words to that effect."

*Count One* (dated April 18, 2025):

> Now, let me be clear. I don't just support the armed . . . the targeted murder and assassination of ICE agents anymore. I was already there. I now support armed resistance against ICE. If they're killing mothers of children who are just going about their day, they deserve death. There's no legitimacy to their law enforcement whatsoever. They deserve death. All of them deserve death. Dismantle the organization, name and shame every single one of them, and then track them so that we can try them in a court of law and we can get justice for the people who have died at these monsters' hands. I, I

> support armed resistance against ICE. I want every agent dead. Everyone. I want anyone in charge of it dead. Everyone. I am willing to go to war. I am willing to personally kill. If you are willing to arm me, let's go to war. Fuck, ICE. Fuck anyone who supports ICE. Death to them all. Help me bring it to them.

Indictment ¶ 6.

*Count Two* (September 18, 2025). The night before, the President had announced on social media that he was "designating ANTIFA . . . AS A MAJOR TERRORIST ORGANIZATION."[5] The next day, Mr. Chandler called:

> I'm a Quaker. I'm a Christian. I practice non-violence and peaceful testimonies. Um, I'm also antifascist, just like my grandfather who built the gallows that hung Nazi war, war criminals after World War II. You could say killing Nazis comes in my family's history. I am Antifa through and through. I'm an antifascist. It is in my blood. It was in my grandfather's blood and in his father's blood. This is the nature of being an American. We fought a whole world war over this. So, I'm gonna make it really clear to ya. I am publicly Antifa. I am an antifascist. I believe that you are evil, and I believe that you; this kind of rhetoric is going to kill people. So how about you come and get me. Come and get me. Come and round me up for being a terrorist since the President has decided that my speech counts as terrorism. Okay, come and round me up. Put me in your fucking concentration camp so that way I can come out when I'm done and build the gallows and come and hang you. Get this President out of office today. This is un-American. It's un-Christian. It's fucking evil. Get him out.

Indictment ¶ 8.

*Count Three* (January 12, 2026). Five days earlier, Renee Good had been shot and killed by an ICE agent in Minneapolis:

> I woke up this morning realizing that violence has become necessary. I'm going to start organizing armed resistance against ICE. I'm

[5] Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 17, 2025); see also President Donald J. Trump, *Designating Antifa as a Domestic Terrorist Organization*, WhiteHouse.gov (Sept. 22, 2025).

> going to start advocating for people to kill them. I'm going to start releasing information publicly. Not on the internet. Not in a way that could be censored. But just with postcards and posters, calling for people to kill ICE agents. I'm going to send out postcards to folks who . . . have restaurants to teach them how to cultivate salmonella and campylobacter so that these ICE, agents can never eat in a public restaurant again out of pure fear that they might leave with food poisoning, and indeed, a large majority of them are going to start experiencing food poisoning. I'm going to build a facial recognition app that identifies these agents and bans them from businesses that businesses can opt into freely. These agents will go through the rest of their lives as pariahs. They will be banned from their own communities, and I'm going to dedicate the next twenty years of my life to making sure of it. (ICE agent, whose identity is known to the grand jury) deserves death. (U.S. Border Patrol officer, whose identity is known to the grand jury) deserves death. (U.S. Official, whose identity is known to the grand jury) deserves death. Donald Trump deserves death . . . Nothing short of death will bring justice, and without justice there will never be peace. You started attacking American citizens, you started killing people, you . . . created death squads, and then you gave them immunity. Death to anyone involved. Death to anyone who advocates for that. Death to them all.

Indictment ¶ 10.

Although they are referred to in Count Three as "ICE agent," "U.S. Border Patrol officer," and "U.S. Official," the three people the indictment leaves unnamed are not anonymous, rank-and-file agents. Two of the three are high-ranking administration officials, and the third was an individual whose identity had been widely published in the national news.[6]

*Count Four* (April 18, 2026):

> Sir, I have, uh, I'm calling this morning 'cause I want you to imagine a scenario. I want you to imagine a scenario where all the 1200 billionaires in this country, all their properties are surrounded

[6] The government produced recordings of the charged voicemails, and of the uncharged voicemails quoted in paragraph 4 of the indictment, in discovery. Because the recordings themselves contain personal identifying information subject to the Protective Order, ECF 23, Mr. Chandler will separately file a motion to lodge the relevant recordings with the Court under seal as Exhibit A. Timestamps refer to those recordings. This motion does not depend on them.

> simultaneously by a thousand people. So, imagine your house, your daughter's house, everyone you know and love who is also rich. Imagine every single one of those homes being surrounded by a thousand people. Then imagine them all getting a text and then, then suddenly taking out their pocket knives, walking slowly towards your house with 10, you got your 10 guards or whatever against a thousand people, and then they come and they pull you out of your house, and they slit your throat, and they slit your daughter's throat, and they slit everyone's throat. That you know, sir, that is the future. It's not a future I want, it's not a future I'm advocating for, but wealth concentration has gotten so bad in this country. The greed has gotten so bad. People are suffering so much, sir, that that is what is in our future. You will not escape their wrath. We must redistribute the wealth away from people like you.

Indictment ¶ 12.

*Count Five* (April 28, 2026; the President). On April 28, 2026, a federal grand jury in North Carolina indicted former FBI Director James Comey for posting a photograph of seashells arranged to read "86 47."[7] That evening, according to the indictment, Mr. Chandler called Elected Official 1 and left another message:[8]

> You've probably getting quite used to my voice. Sir, I'm calling this evening because what I want you to do is, I want you to take a firearm. I want you to put it in your hand. I want you to walk into the Oval Office. I want you to put that firearm to the President's head, and I want you to pull the trigger and I want you to kill him. I am petitioning you, [Elected Official 1] for redress of grievances. My redress of grievances is that this president is awful . . . He's a liar among all liars. He's a great deceiver. He's the antichrist. I want you to walk into the Oval Office with a gun in your hand. I want you to put it to his temple, and I want you to pull the trigger. That is what I want you to do as my agent. That's what I want you to do as my elected official. That's what I am petitioning you to do with my free

---

[7] *See* Indictment, *United States v. Comey*, No. 4:26-cr-16, ECF 1 (E.D.N.C. Apr. 28, 2026); Mem. in Supp. of Mot. to Dismiss Indictment for Lack of a True Threat at 8, *Comey*, No. 4:26-cr-16, ECF 33 (E.D.N.C. July 27, 2026).

[8] The complaint dated this voicemail April 29, 2026. Compl. Aff. ¶¶ 6, 16. Either way, Mr. Chandler left it within a day of the Comey indictment.

> speech. I want you to kill the President. I want you to assassinate the President. That's what I want you to do. Now, [Elected Official 1], are you gonna come after me? Are you going to try me because of my voice and what I said?

Indictment ¶ 14.

**D. What the quotations leave out.**

The indictment's quotations have a habit of stopping one sentence too soon. The recordings produced in discovery supply additional context:

*Count Five.* The indictment's quotation ends with Mr. Chandler's question—"Are you going to try me because of my voice and what I said?" The recording continues: "It is pathetic that you would come after Comey for a fucking Instagram post. You look so fucking weak." Ex. A (Apr. 28, 2026, recording) at 1:18–1:29.

*Paragraph 4(f).* The indictment quotes a January 26, 2026 voicemail that ends, "And if you support them, you deserve death too." The recording continues: "This is an opinion. It's not a threat. I am at my wit's end, [Elected Official 1]. The cruelty, and the evil, and the murder…" Ex. A (Jan. 26, 2026, recording) at 1:10–1:29.

*Paragraph 4(g).* The indictment quotes an April 6, 2026 voicemail that ends, "I'm going to string him up in a fucking tree." The recording continues: "I am going to try and convict the people who caused these murders, and I am going to string them up live on television after they are convicted. And, sir, I am going to run on this." Ex. A (first Apr. 6, 2026, recording) at 0:54–1:09.

*Paragraph 4(i).* The indictment quotes an April 7, 2026 voicemail that ends, "[Elected Official 1], I will hang you." The recording continues: "I'm threatening legal process. I'm threatening trials after I'm given the power and the authority to do it, and I will act on it. I will run on this as a platform. Do not commit war crimes." Ex. A (Apr. 7, 2026, recording) at 1:14–1:29.

**E. Procedural history.**

On May 1, 2026, days after the Count Five voicemail, the government filed a criminal complaint charging Mr. Chandler with two violations of § 115 based on the voicemails now charged in Counts Four and Five, and he was arrested the same day. Compl., ECF 3. On May 20, 2026, a grand jury returned the five-count indictment. ECF 19.

## LEGAL STANDARD

A defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). An indictment must be dismissed for "failure to state an offense," Fed. R. Crim. P. 12(b)(3)(B)(v), when "the specific facts" it alleges "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) (quoting *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002)). Rule 12 thus lets a court "ensur[e] that legally deficient charges do not go to a jury." *Id.* (quoting *United States v. Bergrin*, 650 F.3d 257, 268 (3d Cir. 2011)).

Section 115 punishes one who "threatens to assault, kidnap, or murder" a federal official, a federal law enforcement officer, or an official's immediate family member, with intent to impede, intimidate, interfere, or retaliate. 18 U.S.C. § 115(a)(1)(A)–(B). Because a threats statute "makes criminal a form of pure speech," it "must be interpreted with the commands of the First Amendment clearly in mind." *Watts*, 394 U.S. at 707. As a result, § 115, like every federal threats statute, reaches only "true" threats. *See id.* at 708; *United States v. Fenton*, 30 F. Supp. 2d 520, 524 (W.D. Pa. 1998) ("Section 115(a)(1)(B) proscribes only threatening communications, recognizing that not all apparently threatening utterances fall into the category of 'true threats.'"). A charged

statement that cannot be a true threat falls outside the statute—and outside the Constitution's tolerance for criminal punishment.

The Third Circuit has squarely held that a district court "may properly dismiss an indictment as a matter of law if it concludes that no reasonable jury could find that the alleged communication constitutes a threat or a true threat." *Stock*, 728 F.3d at 298. That is no novelty: "in *Watts*, the Supreme Court held as a matter of law that the defendant's statement was merely 'political hyperbole.'" *Id.* The Supreme Court held that the trial judge "erred in denying" Watts's motion for acquittal and ordered "entry of a judgment of acquittal." *Watts,* 394 U.S. at 707–08. Many other courts have done the same. *See, e.g.*, *United States v. Landham*, 251 F.3d 1072, 1080–83 (6th Cir. 2001) (indictment's threat counts "should have been dismissed"); *United States v. White*, 670 F.3d 498, 513–14 (4th Cir. 2012) (affirming judgment of acquittal on charge for posts indicating that anti-Nazi activist "should be drug [sic] out into the street and shot"); *United States v. Bagdasarian*, 652 F.3d 1113, 1122 (9th Cir. 2011) (reversing convictions for posts stating "Re: Obama fk the n[-word], he will have a 50 cal in the head soon" and "shoot the n[-word]"); *United States v. Lincoln*, 403 F.3d 703, 707 (9th Cir. 2005) (reversing conviction because letter to the President was the defendant's "crude and offensive method of stating political opposition," and "such political hyperbole does not constitute a 'threat'"); *United States v. O'Dwyer*, 443 F. App'x 18, 20 (5th Cir. 2011) (affirming dismissal of indictment alleging defendant stated that his bankruptcy creditors would be "at risk if I DO become homicidal," because "no reasonable jury could find that O'Dwyer's communication constitutes a true threat"); *Fenton*, 30 F. Supp. 2d at 527 (granting judgment of acquittal on § 115 count); *United States v. Crouse*, No. 1:25-cr-393-RP, ECF 77 at 9–11 (W.D. Tex. Feb. 16, 2026) (dismissing count based on voicemails left at a United

States Senator's office "urging V5 and V5's staff to kill themselves"; the statements "may be crass, abrasive, and undesirable—but they are not, as a matter of law, true threats"); *United States v. Joudeh*, No. 6:25-cr-290, 2026 WL 2234671, at *5 (M.D. Fla. Aug. 1, 2026) (applying *Stock* and dismissing indictment because the charged statement "is simply not a threat. No reasonable jury could conclude otherwise.").

As the Sixth Circuit recently put it, "courts retain the power to remove a true-threat question from the jury's consideration, or override its verdict, if the evidence shows that the speech was protected as a matter of law." *Hess v. Oakland Cnty.*, 174 F.4th 981, 993 (6th Cir. 2026).

In making that call, the Court considers "the context and totality of the communication," and it is "incumbent on the Government to make that context clear" in the indictment. *Stock*, 728 F.3d at 301 (quoting *Landham*, 251 F.3d at 1080); *see also United States v. Miah*, 120 F.4th 99, 107 (3d Cir. 2024) ("[T]he context and totality of circumstances of the communications must be considered when assessing whether a threat has been alleged."). The government did that here. The indictment quotes each charged voicemail and eleven uncharged ones. At this stage, nothing about what Mr. Chandler said is in dispute. The only question is a legal one: whether the charged words, in the context the government itself pleaded, constitute true threats. That question belongs to the Court in the first instance. In First Amendment cases, courts must "be sure that the speech in question actually falls within the unprotected category and . . . confine the perimeters of any unprotected category within acceptably narrow limits," and judges bear "a special responsibility . . . whenever it is claimed that a particular communication is unprotected." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 (1984).

## ARGUMENT

The indictment fails because none of the charged voicemails is a true threat. Part I explains why. The First Amendment gives political speech a wide berth; *Counterman*'s recklessness requirement adds a second layer of protection for speakers rather than lowering the bar for a true threat; the context the government pleaded marks all five voicemails as core political speech; and each voicemail, taken on its own terms, falls into a category of speech the Supreme Court has held protected—a demand that someone else act (Count Five), a prediction of what others will do (Count Four), a conditional statement (Count Two), and abstract advocacy (Counts One and Three). Part II explains why the Court should say so now, rather than after a trial.

### I. THE CHARGED VOICEMAILS ARE POLITICAL HYPERBOLE, NOT TRUE THREATS.

#### A. The First Amendment protects even violent political rhetoric; "true threats" are a narrow exception.

The First Amendment does not ask courts to walk a tightrope between protected speech and true threats. It marks out a broad field of protected expression—hyperbole, advocacy, prediction, exhortation, insult—and carves from it one narrow exception. "True threats of violence" fall outside the First Amendment. *Counterman*, 600 U.S. at 72. But a true threat is a "serious expression[]" conveying that a speaker "means to 'commit an act of unlawful violence.'" *Id.* at 74 (quoting *Black*, 538 U.S. at 359); *see also United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022) (describing true threats as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."). The danger must come from the speaker. "The 'true' in that term distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow." *Id.* As the Seventh Circuit put

it, "the scope of a true threat is ultimately quite circumscribed. Section 871(a) does not criminalize offensive jokes or political hyperbole—bad taste, in other words, is not a crime." *United States v. Dutcher*, 851 F.3d 757, 761 (7th Cir. 2017).

Everything on the other side of that line is protected, however violent or caustic its vocabulary. The Supreme Court has held protected a draft protester's vow that "the first man I want to get in my sights is L. B. J.," *Watts*, 394 U.S. at 706, 708; a civil-rights leader's warning that "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck," *Claiborne Hardware*, 458 U.S. at 902, 928; a demonstrator's shout that "[w]e'll take the fucking street later," *Hess v. Indiana*, 414 U.S. 105, 107–09 (1973); and a public employee's remark, upon hearing of an attempt on the President's life, that "if they go for him again, I hope they get him." *Rankin v. McPherson*, 483 U.S. 378, 380, 386–87 (1987) (agreeing that the remark could not "properly be criminalized at all"). The government may not punish "advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Even "the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence" is protected, because doing so "is not the same as preparing a group for violent action and steeling it to such action." *Id.* at 448 (quoting *Noto v. United States*, 367 U.S. 290, 297–98 (1961)).

Political speech gets the most protection, not the least. Expression on public issues "has always rested on the highest rung of the hierarchy of First Amendment values." *Claiborne Hardware*, 458 U.S. at 913 (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."

*Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). And dissenting political speech sits "at the First Amendment's core." *Counterman*, 600 U.S. at 81. The Third Circuit has said the same thing in a threats case about the President: "the First Amendment was meant to encompass not only learned political discourse but also vituperative verbal and written attacks on the President and other high government officials." *United States v. Kosma*, 951 F.2d 549, 553 (3d Cir. 1991). That is because "[t]he language of the political arena . . . is often vituperative, abusive, and inexact." *Watts*, 394 U.S. at 708 (citation omitted). And it is because "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949); *see also Rankin,* 483 U.S. at 387 ("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."); *Osborne v. Ohio*, 495 U.S. 103, 148 (1990) (Brennan, J., dissenting) ("When speech is eloquent and the ideas expressed lofty, it is easy to find restrictions on them invalid. But were the First Amendment limited to such discourse, our freedom would be sterile indeed.").

To separate hyperbole from threat, the Third Circuit considers "the totality of the circumstances and not just the words in isolation, whether the threat is 'conditional,' and the reaction of the listeners." *United States v. Fullmer*, 584 F.3d 132, 154 (3d Cir. 2009). It treats as "a significant factor . . . whether a speaker identifies himself as the person who will inflict injury on another or whether the speaker merely suggests that harm will befall another by someone's hand." *Stock*, 728 F.3d at 300 (citing *Kosma*, 951 F.2d at 554); *see also Landham*, 251 F.3d at 1084 ("Significantly, Landham does not state that he is going to take Adams' children away, but refers

to third parties, a body empowered with the legal power to 'convict' Adams. Landham is obviously referring to legal entities, with the power to take away custody as well as to charge Adams with illusory crimes.").

The objective inquiry exists precisely to "shield[] individuals from culpability for communications that are not threatening to a reasonable person, distinguishing true threats from hyperbole, satire, or humor." *United States v. Elonis*, 841 F.3d 589, 596–97 (3d Cir. 2016). And because "the undesirability of [disturbing] speech will place a heavy thumb in favor of silencing it," "First Amendment vigilance is especially important when speech is disturbing, frightening, or painful." *Counterman*, 600 U.S. at 87 (Sotomayor, J., concurring in part and concurring in the judgment).

### B. *Counterman*'s recklessness requirement is an added protection for speakers, not a substitute for an objective true threat.

Because the Supreme Court's decision in *Counterman* is recent, and its holding is often misread or misapplied, it is worth being precise about what it did. *Counterman* did not change the objective standard for what a true threat is. It added a second requirement on top of the first. The analysis runs in order. The first question is objective: whether the statement, in context, is a "serious expression" conveying that the speaker means to commit unlawful violence. Only if the answer is yes does the speaker's state of mind come into play, as another element the government must also prove. An absence of recklessness can defeat a prosecution that clears the first step. But its presence cannot rescue one that fails it. And because this motion turns on the first step, nothing the government alleges about Mr. Chandler's intent can save the indictment.

The Supreme Court set that order of operations long ago. In *Watts*, the lower courts had divided over the mental state the presidential-threats statute required, and the Supreme Court

voiced "grave doubts" about the reading the court of appeals there had adopted. 394 U.S. at 707–08. But it didn't need to resolve that problem to decide *Watts*, because "whatever the 'willfullness' requirement implies, the statute initially requires the Government to prove a true 'threat.'" *Id.* at 708. Watts's words stating that he would get L.B.J. in his rifle sights were political hyperbole, so the case ended at the first step. *Id.*

*Counterman* kept that structure. It reaffirmed that true threats are "serious expression[s]" conveying that a speaker means to "commit an act of unlawful violence," and it explained that "[w]hether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat." *Counterman,* 600 U.S. at 74 (quoting *Black*, 538 U.S. at 359). "The existence of a threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end." *Id.* (quoting *Elonis v. United States*, 575 U.S. 723, 733 (2015)). The Court expressly rejected the view that "the category of true threats itself incorporates a mens rea element." *Id.* at 74 n.3.

The Third Circuit likewise treats the objective and subjective inquiries as distinct components, each of which the government "must satisfy." *Elonis*, 841 F.3d at 596; *accord Miah*, 120 F.4th at 108. The Ninth Circuit recently put the point more bluntly: "A threat is a threat, whatever the speaker's mental state." *United States v. Anten,* 184 F.4th 1115, 1123 (9th Cir. 2026). To convict, "the government must prove that a defendant both made an objective 'threat,' and that he did so with the necessary subjective mental state." *Id.*

Having fixed the objective definition, *Counterman* then added a further protection: "[T]he First Amendment may still demand a subjective mental-state requirement shielding some true threats from liability." *Counterman*, 600 U.S. at 75. The reason was the chilling effect: a speaker

unsure where the line falls, or afraid the legal system will draw it wrong, may "swallow words that are in fact not true threats." *Id.* at 75–78. So the Court required proof that the speaker also "consciously disregarded a substantial risk that his communications would be viewed as threatening violence"—*i.e.,* that he was aware "that others could regard his statements as" threatening violence and "deliver[ed] them anyway." *Id.* at 69, 79 (quoting *Elonis*, 575 U.S. at 746 (Alito, J., concurring in part and dissenting in part)). *Counterman*'s own case shows how the pieces fit. The Colorado courts, "[u]sing the established objective standard," had held that Counterman's messages were "true threats." *Id.* at 72. The Supreme Court did not question that conclusion. It vacated the conviction anyway, because the State "had to show only that a reasonable person would understand his statements as threats" and "did not have to show any awareness on his part that the statements could be understood that way." *Id.* at 82–83. Even the dissent described the holding as "a buffer zone that protects true threats" unless the speaker also acted recklessly. *Id.* at 108 (Barrett, J., dissenting).

Two consequences follow here. First, the government's bald allegations about what Mr. Chandler knew or intended cannot make up for what his words did not convey. Allegations that a speaker knew his words were inflammatory—or expected that the government might prosecute him for them—go, at most, to recklessness, and recklessness matters only if the words are a true threat to begin with. Treating the two as interchangeable would turn *Counterman* on its head.

The same is true of § 115's separate specific-intent element—intent "to impede, intimidate, or interfere with" an official, or to retaliate against him. 18 U.S.C. § 115(a)(1). That intent element presupposes a threat; it does not create one. A constituent who wants Elected Official 1 to feel political heat—who tells him there is "no statute limitations on war crimes" and

that he "will be brought to justice" "through the rule of law," Indictment ¶ 4(k)—may well intend to influence or impede whatever evil he perceives the official is doing. But an intent to pressure an official with political speech is not a threat of violence, and no quantity of intent to impede or interfere can make it one. An individual engaged in protected speech is free to speak whatever their intent. And a jury finding of recklessness could no more convert political hyperbole into a true threat than a finding of willfulness could have saved the conviction in *Watts*. *See* 394 U.S. at 708.

### C. The context pled in the indictment marks every charged voicemail as political speech.

Start with where Mr. Chandler spoke and to whom. Every voicemail was left for a Member of Congress. Indictment ¶¶ 6, 8, 10, 12, 14. A congressional office line is the modern-day petition box. The right "to petition for a redress of grievances" is "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967). The Petition Clause "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011). And Mr. Chandler left no doubt about what he was doing here: "I am petitioning you," he told Elected Official 1, "for redress of grievances." Indictment ¶ 14.

Courts protect that kind of call. Reversing the conviction of a man who placed abusive, anonymous calls to the United States Attorney's office, the D.C. Circuit explained that "complaints about the actions of a government official were a significant component of his calls." *United States v. Popa*, 187 F.3d 672, 677 (D.C. Cir. 1999). A statute that failed to protect "the political speech of one who intends both to communicate his political message and to annoy his auditor—an auditor who might be his elected representative . . . —from whom the speaker seeks redress" could not be constitutionally applied. *Id.* at 678. The Third Circuit asks how a statement

"would be interpreted by those to whom the maker communicates the statement." *Kosma*, 951 F.2d at 557 (emphasis omitted). Here, those people were congressional staff, listening to a line to receive the public's grievances—including its angriest ones—from a caller who identified himself by name and address and who called, by his own account, "every day." Indictment ¶ 4(e).

Next, the subject matter. Every charged voicemail concerns public policy: immigration enforcement, war, wealth inequality, and the fitness of the President. The indictment says so. Indictment ¶ 4; *see id.* ¶¶ 6, 8, 10, 12, 14. The voicemails respond, often within days, to national news—an ICE killing, a terrorism designation, a war, an indictment of a prominent critic of the President for alleged threats. *See supra* Background, Parts A, C. That is the stuff of political debate.

Third, the speaker. The indictment pleads that Mr. Chandler was "running" for office, Indictment ¶ 4(g), and public records confirm he is a registered Senate candidate. He identified himself when he called. Compl. Aff. ¶ 13. He said what he wanted: arrests, convictions, trials, executions, the abolition of ICE, the redistribution of wealth, and the removal of the President. Indictment ¶¶ 4(c), (e), (g)–(i), (k), 8, 12. When he spoke of officials dying, he spoke—again and again—of trials and convictions first. *Id.* ¶¶ 4(c), (e), (h), (i), (k), 6. Federal law makes treason, and war crimes resulting in death, punishable by death. 18 U.S.C. §§ 2381, 2441(a). One may think Mr. Chandler's views about who is guilty of those crimes are wrong, even repellent. But a candidate who promises to prosecute officials and see them executed after conviction is making a campaign promise—an alarming one, perhaps—not threatening to "commit an act of *unlawful* violence" himself. *Counterman*, 600 U.S. at 74 (emphasis added).

Courts have drawn exactly that distinction. The Sixth Circuit recently held that a citizen who said "hang Joe for treason" about a county elections director was likely to succeed on his

claim that the statement "constituted protected speech, not a true threat." *Hess*, 174 F.4th at 987. And the Eighth Circuit ordered an acquittal where a prisoner wrote to his own lawyer that "you are the first S.O.B. that will go, Sam Sechser [the prosecutor] will next," because "a number of innocuous interpretations . . . are equally plausible"—among them, that he meant to file a complaint seeking his lawyer's discharge. *United States v. Barcley*, 452 F.2d 930, 932–33 (8th Cir. 1971). A client's complaint about his lawyer, the court explained, "falls within the purview of the First Amendment whether phrased in the King's English or peddler's French." *Id.* at 933. So does a constituent's complaint to his representative.

Fourth, consider what is missing. In the Third Circuit's leading cases allowing threats charges to proceed, the speaker cast himself as the actor and supplied some concrete marker of real-world danger: Kosma's time, date, and place, *Kosma,* 951 F.2d at 554–55; Miah's surveillance of an agent's home and harassment of his wife, *Miah,* 120 F.4th at 105–08; the SHAC campaign's record of actual vandalism, harassment, and an assault, which made its "implied threats" anything but "conditional," *Fullmer*, 584 F.3d at 155–57; Stock's post describing hours spent "looking for" a named police officer and wishing he could have been "the one" to kill him, *Stock,* 728 F.3d at 290, 299–301. The indictment here alleges nothing like that—no plan, no surveillance, no time, no place, no step toward anyone. The only weapons the indictment says Mr. Chandler had are a knife and a dagger he told Elected Official 1 he bought "not because I want to do any harm to anyone," but because he was "terrified for my life." Indictment ¶ 4(a). People planning violence do not ordinarily leave a voicemail with their name and address explaining that they are frightened. *Cf. Fogel v. Collins*, 531 F.3d 824, 831 (9th Cir. 2008) ("reasonable observers would be hard-pressed to believe that an actual suicide bomber would so boldly announce his presence and intentions").

Finally, the indictment's conclusory characterizations of Mr. Chandler's actions do not change the picture. It alleges that Mr. Chandler "shared his plan to publish personal identifiable information of ICE agents." Indictment ¶ 4. The plan the indictment actually quotes is to make agents social "pariahs" through an app "that businesses can opt into freely." *Id.* ¶ 10. Organized social ostracism is protected: "[s]peech does not lose its protected character . . . simply because it may embarrass others or coerce them into action." *Claiborne Hardware*, 458 U.S. at 910. So is publicizing officials' identities to hold them to account: "[m]erely publishing an officer's address and phone number, even with intent to intimidate, is not a 'true threat' as defined in constitutional law jurisprudence." *Brayshaw v. City of Tallahassee*, 709 F. Supp. 2d 1244, 1248 (N.D. Fla. 2010).

The indictment also says Mr. Chandler "implied knowing where Members of Congress lived." Indictment ¶ 4. It quotes no such statement. The closest candidates are his self-introduction as "your neighbor," *id.* ¶ 4(h)—an ordinary way for a constituent to describe himself—and Count Four's hypothetical about the homes of "all the 1200 billionaires in this country," *id.* ¶ 12. And even genuinely alarming statements outside the charged words would not change what those words say. In *Lincoln*, the defendant had told a federal agent that he planned to "stake out the White House and shoot the President through an open limousine window." 403 F.3d at 704. Six months later, he wrote to the President: "You Will Die too George W Bush real Soon." *Id.* at 705. The Ninth Circuit reversed his conviction anyway: "The fact that Lincoln stated six months earlier that he planned to shoot the President does not give new meaning to Lincoln's statement that Bin Laden or Al Qaeda will kill the President." *Id.* at 707.

In short, the government has pled a political campaign conducted by telephone. That context does not make the charged words gentler. But it makes them what they are: political hyperbole.

### D. Each charged voicemail is protected speech.

#### 1. Count Five: Asking a Member of Congress to shoot the President is a protest, not a threat.

Count Five is the government's most sensational charge, and its weakest. It charges Mr. Chandler with threatening to murder the President. But the voicemail does not say that Mr. Chandler will do anything to anyone. It asks Elected Official 1 to do it—"as my agent," "as my elected official." Indictment ¶ 14. And read in all its context, Mr. Chandler was making a political point about what he perceived as threats to freedom of speech demonstrated by the prosecution of James Comey, not seriously soliciting Elected Official 1 to kill the President.

Count Five fails because "[t]he threat statute . . . does not criminalize predictions or exhortations to others to injure or kill the President." *Bagdasarian*, 652 F.3d at 1119. The Third Circuit treats as "significant" the difference between a speaker who "identifies himself as the person who will inflict injury" and one who "merely suggests that harm will befall another by someone's hand." *Stock*, 728 F.3d at 300. In *Kosma,* it drew exactly that line in distinguishing *Rankin*: Kosma's letters "implied that Kosma *himself* would be the person who would kill the President, while McPherson's statement merely expressed a desire that *another person* kill the President." *Kosma*, 951 F.2d at 554 (emphasis in original). McPherson hoped an assassin would succeed; the Supreme Court agreed that her words could not "properly be criminalized at all." *Rankin*, 483 U.S. at 387. To be sure, a wish can be a threat "in the right context," *Stock*, 728 F.3d at 301—as in *Stock* itself, where the wish followed an account of hours spent hunting for the target.

*id.* at 290, 299–301. Nothing like that is alleged here. Other circuits agree that calls for others to engage in violence are not true threats. A post demanding that a named man "should be drug out into the street and shot" and "must be killed" "at most conveyed a *serious desire* that [he] be harmed by others but did not convey a *serious expression of intent* to do harm." *White*, 670 F.3d at 505–06, 514 (emphasis in original); *see also Bagdasarian*, 652 F.3d at 1119.

District courts have applied the same principle to dismiss charges before trial. In *Crouse*, the defendant left voicemails at a United States Senator's office urging that the Senator "should kill himself" and telling staff, "You should all fucking kill yourselves, especially John Cornyn, put a fucking gun in your mouth and scream as you pull the trigger." *Crouse*, slip op. at 3. The court dismissed the count because those statements "make no reference to Defendant himself committing any violence" and so "cannot . . . be 'serious expressions conveying that [the] speaker means to commit an act of unlawful violence.'" *Id.* at 11.

Count Five is weaker still than those cases, because of whom Mr. Chandler asked. He did not post to a crowd of strangers, any of whom might be moved to act. He "petition[ed]" a sitting Member of Congress to walk into the Oval Office with a gun and shoot President Trump in order to "redress" his "grievances." Indictment ¶ 14. He then criticized the prosecution of James Comey for his allegedly threatening speech. *See supra* Background, Part D. No reasonable listener could think that Mr. Chandler's request would be granted, and no reasonable listener could think Mr. Chandler thought that it might be. The absurdity is the point. It is the rhetorical move of a man who had spent a year demanding that Elected Official 1 use his office against a President he regarded as a tyrant—"[y]ou must arrest the President. You must impeach him. You must convict him." Indictment ¶ 4(c).

Mr. Chandler said as much. He framed the call as a petition: "I am petitioning you, [Elected Official 1] for redress of grievances." *Id.* ¶ 14. He described his words as speech: "That's what I am petitioning you to do with my free speech." *Id.* And he ended with questions no would-be assassin would ask: "Now, [Elected Official 1], are you gonna come after me? Are you going to try me because of my voice and what I said?" *Id.* He left that message within a day of the government's indictment of a former FBI Director for an Instagram post. *See supra* Background, Part C. He was testing the line, provocatively and offensively, in protest of what he saw as the prosecution of speech. That is "a kind of very crude offensive method of stating a political opposition to the President." *Watts*, 394 U.S. at 708 (internal quotation marks omitted). It is not a true threat.[9]

The message's audience confirms this point. The President was not its recipient, and the indictment does not allege that Mr. Chandler meant for or could reasonably have expected it to reach him. *Cf. White*, 670 F.3d at 513 (posts "not sent directly" to their subject); *Fenton*, 30 F. Supp. 2d at 530 (holding that "intent to retaliate within the meaning of § 115(a)(1)(B) can exist only when the speaker intends that his threat be communicated to its object" and granting judgment of acquittal "because there is no evidence that Fenton intended his threat to be communicated to Congressman Murtha"); *Hess,* 174 F.4th at 994 ("[D]istance between the speaker and recipient may tend to diminish a statement's threatening nature . . . . By removing himself to the lobby, speaking in a 'normal conversational tone,' and directing his comment only

---

9 Nor could the government recast Count Five as solicitation or incitement, which it did not charge. A voicemail asking an elected Member of Congress to do something no one could expect him to do is not a serious "proposal to engage in illegal activity," *United States v. Williams*, 553 U.S. 285, 298 (2008), and it is not "directed to inciting or producing imminent lawless action." *Brandenburg*, 395 U.S. at 447. Plus, as discussed, the remainder of the message shows as context that Mr. Chandler was intending to make a political point about James Comey's prosecution to Elected Official 1, not seriously attempting to incite Elected Official 1 to engage in violence.

to Giobachi, Hess lowered the statement's temperature and the likelihood that it would reach Rozell, directly or secondhand."); *White*, 670 F.3d at 513 ("While a direct threat of that type would not always be necessary, for White to have called on others to kill Warman when the others were not even part of White's organization, amounted more to political hyperbole of the type addressed in *Watts* than to a true threat.").

A voicemail asking one elected official to harm another, left with someone who will clearly not act, never delivered to its supposed target, and clearly offered to make a political point, conveys no "real possibility that violence will follow." *Counterman*, 600 U.S. at 74; *see also White,* 670 F.3d at 513 ("While a direction to others to kill Warman could have amounted to a threat if White had some control over those other persons or if White's violent commands in the past had predictably been carried out, none of that context exists in this case.").

**2. Count Four: A prediction of violent upheaval or revolution, expressly disavowed, is not a threat.**

Count Four begins: "I want you to imagine a scenario." Indictment ¶ 12. What follows is a vision of a nationwide uprising in which "a thousand people" simultaneously surround the homes of "all the 1200 billionaires in this country." *Id.* The actors are "a thousand people"—"they," not "I." The speaker's role is narrator, and he disclaims any other: "It's not a future I want, it's not a future I'm advocating for." *Id.* His point is about policy: "wealth concentration has gotten so bad in this country. The greed has gotten so bad. People are suffering so much, sir, that that is what is in our future. . . . We must redistribute the wealth away from people like you." *Id.* Even the closing warning is about others: "You will not escape *their* wrath." *Id.* (emphasis added).

A statement that "merely suggests that harm will befall another by someone's hand" sits comfortably at the protected end of the spectrum. *Stock*, 728 F.3d at 300. "[G]enerally, a person

who informs someone that he or she is in danger from a third party has not made a threat, even if the statement produces fear." *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 196 (2d Cir. 2001); *see also Bagdasarian*, 652 F.3d at 1119, 1122 (statement "predictive in nature" was not a true threat "[a]s a matter of law"); *United States v. Cassel*, 408 F.3d 622, 636–37 (9th Cir. 2005) (a threat must be "of injury brought about—rather than merely predicted—by the defendant," and "the First Amendment requires as much"). A prediction the speaker expressly disavows—"not a future I want," "not a future I'm advocating for"—is the opposite of a "serious expression" of his own intent to commit violence. *Counterman*, 600 U.S. at 74.

Warning the powerful that injustice will breed violence is one of the oldest moves in American political speech. President Kennedy told a gathering of diplomats that "[t]hose who make peaceful revolution impossible will make violent revolution inevitable."[10] From the steps of the Lincoln Memorial, Dr. King warned that "[t]he whirlwinds of revolt will continue to shake the foundations of our nation until the bright day of justice emerges."[11] Mr. Chandler is neither President Kennedy nor Dr. King. And the scenario he imagined was far cruder than theirs. But its structure was the same: injustice, then upheaval, unless the listener changes course. That is political argument, not threat.

The government's § 115(a)(1)(A) theory—that the voicemail threatened Elected Official 1's daughter—fares no better. The daughter is not singled out. She appears in a list—"your house, your daughter's house, everyone you know and love who is also rich"—inside a hypothetical about

---

[10] John F. Kennedy, Address on the First Anniversary of the Alliance for Progress (Mar. 13, 1962).

[11] Martin Luther King Jr., *I Have a Dream*, Address at the March on Washington for Jobs and Freedom (Aug. 28, 1963).

the families of an entire class, including Elected Official 1. Indictment ¶ 12. Nor does it help the government that, the same day, Mr. Chandler told Elected Official 1 "I will do it myself." *Id.* ¶ 4(k). The very next sentence says what he meant: "It'll be through the rule of law, but you will be brought to justice." *Id.*

### 3. Count Two: A defiant dare conditioned on the government building concentration camps is *Watts* all over again.

Count Two opens with a declaration of pacifism: "I'm a Quaker. I'm a Christian. I practice non-violence and peaceful testimonies." Indictment ¶ 8. It closes with a demand for political action: "Get this President out of office today." *Id.* Between, Mr. Chandler responded to the news of the day. The night before, the President had announced that he was designating "ANTIFA" a "MAJOR TERRORIST ORGANIZATION." *See supra* Background, Part C. Mr. Chandler's answer was defiance: "I am publicly Antifa. . . . So how about you come and get me. Come and get me. Come and round me up for being a terrorist since the President has decided that my speech counts as terrorism." Indictment ¶ 8.

Only then comes the line the government charges: "Put me in your fucking concentration camp so that way I can come out when I'm done and build the gallows and come and hang you." *Id.* The statement is conditional on its face, and the condition is the message. The condition is: if the United States government imprisons me in a concentration camp for my speech. That is no more realistic, and no more seriously meant, than Watts's "[i]f they ever make me carry a rifle." *Watts,* 394 U.S. at 706. The Supreme Court held that Watts's statement, "[t]aken in context, and regarding the expressly conditional nature of the statement," could not be "interpreted otherwise" than as political hyperbole. *Id.* at 708. The same is true here. The Fifth Circuit reached the same conclusion about a statement that was "hypothetical and conditional"—"suppose I

become 'homicidal'? . . . a number of scoundrels might be at risk if I DO become homicidal"—and affirmed dismissal of the indictment. *O'Dwyer*, 443 F. App'x at 19–20. To be sure, a statement that is only "grammatically conditional" can still be a threat. *United States v. Bly*, 510 F.3d 453, 459 (4th Cir. 2007); *see Kosma*, 951 F.2d at 554 n.8. But this condition is not a fig leaf over a promise of violence. It is a dare, addressed to a government Mr. Chandler accused of treating political dissent as terrorism. And its premise is a dystopia he hoped would never come. The Ninth Circuit held protected a similar dare—"PULL ME OVER! PLEASE, I DARE YA[.]"—painted on a van alongside the words "I AM A FUCKING SUICIDE BOMBER COMMUNIST TERRORIST!" *Fogel*, 531 F.3d at 827, 832. "It makes no difference," the court explained, "that the speech, taken literally, may have communicated a threat." *Id.* at 832.

The imagery of the gallows confirms it. Mr. Chandler tied it expressly to his grandfather, "who built the gallows that hung Nazi war, war criminals after World War II." Indictment ¶ 8. The gallows he invoked were the gallows of Nuremberg—where, as Justice Jackson put it, the victors chose to "stay the hand of vengeance and voluntarily submit their captive enemies to the judgment of the law."[12] The message is not "I will kill you." It is "someday, people like you will answer for this crime, the way the Nazis did." That is a political accusation, made in the most inflammatory terms available. The First Amendment protects it. *See Hess*, 174 F.4th at 994 (defendant's "hang Joe for treason" statement "likely did not constitute a true threat" for reasons including "his invocation of an archaic form of punishment rather than a common, modern device").

---

12 Robert H. Jackson, *Opening Statement Before the International Military Tribunal* (Nov. 21, 1945).

### 4. Counts One and Three: Advocacy of violent resistance to a federal agency is protected speech.

Counts One and Three involve speech that certainly indicated abstract support for "armed resistance against ICE" and the death of ICE officials. But the question is not whether the words are violent or call for violence; it is whether they convey that Mr. Chandler meant to commit violence. They do not.

Mr. Chandler said so himself. Count One: "I support armed resistance against ICE." Indictment ¶ 6. Count Three: "I'm going to start advocating for people to kill them. I'm going to start releasing information publicly. . . . [J]ust with postcards and posters, calling for people to kill ICE agents." *Id.* ¶ 10. A declaration of what one "support[s]" and a plan to "advocat[e]" for violent resistance are, by definition, political advocacy. And advocacy of violent or revolutionary force is protected unless it is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447. A voicemail to an elected official incites no one. *See Claiborne Hardware*, 458 U.S. at 927–28; *Hess*, 414 U.S. at 108 ("advocacy of illegal action at some indefinite future time" is protected). Doubly so when the context of the voicemail is petitioning an elected official for political change.

The courts of appeals apply the same rule. "[O]nly speech that explicitly or implicitly encourages the imminent use of violence or lawless action is outside the protection of the First Amendment." *Nwanguma v. Trump*, 903 F.3d 604, 609 (6th Cir. 2018). "The protection afforded an individual's abstract advocacy of lawlessness endures even if the individual hopes that someday such lawlessness may occur." *McCoy v. Stewart*, 282 F.3d 626, 631 n.5 (9th Cir. 2002). And it extends to endorsing violence against the President himself: the letter in *Lincoln* was protected because its author "was exercising his constitutional right to endorse the violent actions of Bin

Laden and Al Qaeda, which is protected speech." *Lincoln,* 403 F.3d at 707. Count Three's opening line—"I woke up this morning realizing that violence has become necessary"—is a statement of what *Brandenburg* and *Noto* protect: belief in "the moral propriety or even moral necessity for a resort to force and violence." *Brandenburg,* 395 U.S. at 448 (quoting *Noto*, 367 U.S. at 297–98).

The refrain that agents and officials "deserve death" is a moral judgment, not a statement of intent. "'I will kill you' suggests danger from the speaker, while, 'you deserve to die' suggests a prediction or exhortation." *United States v. Turner*, 720 F.3d 411, 432 (2d Cir. 2013) (Pooler, J., dissenting).[13] Courts have drawn the same line in dismissing charges and reversing judgments. A post saying of a federal judge, "I wish someone would in alive [sic] him," was "simply a vague desire that someone was no longer alive." *Joudeh*, 2026 WL 2234671, at *4. And the Ninth Circuit agreed that a professor's published wish for "a two-ton slate of polished granite" to "someday drop" on a college official's head was "hyperbole of the sort found in non-mainstream political invective" and "patently *not*" a true threat. *Bauer v. Sampson*, 261 F.3d 775, 780, 783–84 (9th Cir. 2001) (emphasis in original) (quoting district court).

In Mr. Chandler's voicemails, the death he demanded was the death he believed the law should impose after trial. Count One itself calls to "track them so that we can try them in a court of law and we can get justice for the people who have died at these monsters' hands." Indictment ¶ 6. The same day as Count Three, he promised to "destroy their lives in every legal way

[13] The *Turner* majority affirmed a § 115 conviction, but on facts nothing like these. Turner posted that three named federal judges "deserve to be killed," then published their photographs, work addresses, room numbers, and a map of their courthouse marked to show "[a]nti-truck bomb barriers," against the backdrop of his own earlier boast about the murder of another judge's family. 720 F.3d at 415–17, 423. Nothing in this indictment resembles that kind of targeting for actual violence.

imaginable and open to me" and to "call for their justice, for their conviction for these murders until the day I die." *Id.* ¶ 4(e). And despite the phrasing of the indictment, the officials Count Three says "deserve[] death" were not anonymous agents on a street corner. Two of the three are high-ranking administration officials, and the third was an individual whose identity was widely published in the national news. *See supra* Background, Part C. Saying that the architects of a policy "deserve death" for its consequences may be considered ugly. But it is also the language of political condemnation—the same language the President himself used when he declared that six Members of Congress had engaged in "SEDITIOUS BEHAVIOR, punishable by DEATH!" *See infra* Part II.A.

The government will point to Count One's most pointed words: "I am willing to go to war. I am willing to personally kill. If you are willing to arm me, let's go to war." Indictment ¶ 6. Read in full, those words carry a condition worthy of *Watts*. Watts would shoot the President only if the government armed him by drafting him. 394 U.S. at 706. Mr. Chandler would "go to war" only if Elected Official 1 armed him, which he obviously did not expect Elected Official 1 to do. And "war" is the vocabulary of collective political struggle—the "armed resistance" Mr. Chandler said he "support[ed]"—not of a private plan to ambush someone. The voicemail ends not with a pledge but a plea: "Help me bring it to them." Indictment ¶ 6. That is a request that Elected Official 1 join a cause, not an announcement that Mr. Chandler is in fact planning to kill anyone.

The breadth of officials who were targets of Mr. Chandler's ire points the same way. To be sure, a threat against a group can be a true threat. *See Miah*, 120 F.4th at 108. But breadth is still context, and here it confirms the nature of the speech. Mr. Chandler declared rhetorical war on "every agent," "anyone in charge of it," and "anyone who supports ICE." Indictment ¶ 6. That

is how people talk about institutions and policies, not how they announce attacks on people. "[S]peech that can reasonably be characterized as political rhetoric or hyperbole, particularly such speech not directed at specific individuals, is protected." *Fogel*, 531 F.3d at 830. Miah, by contrast, named the particular agents investigating him and surveilled one agent's home and the FBI's field office. *Miah,* 120 F.4th at 105–08.

Count Three's "plan" is hyperbole on its face. Mr. Chandler said he would mail postcards teaching restaurant owners how to culture bacteria, "so that these ICE, agents can never eat in a public restaurant again out of pure fear," and predicted that "a large majority of them are going to start experiencing food poisoning." Indictment ¶ 10. He then said he would build an app "that businesses can opt into freely," so that agents would "go through the rest of their lives as pariahs." *Id.* The stated aim is ostracism and fear of eating out—not violence inflicted by Mr. Chandler. And the claim that one man sending postcards to restaurants would sicken "a large majority" of a national law-enforcement agency is the kind of "inexact" rhetoric that marks "the language of the political arena." *Watts*, 394 U.S. at 708; *see also Solomon v. Petray*, No. 5:10-cv-05163, 2013 WL 210894, at *5 (W.D. Ark. Jan. 18, 2013) ("[T]he mere wish that a person die from a slow and painful disease does not constitute a true threat."). Even taken literally, it is a plan to persuade others—by sending "postcards and posters" to restaurant owners—not a promise to act. Indictment ¶ 10.

Finally, the audience. Neither voicemail was sent to ICE, to any ICE agent, or to any of the officials named in the threat. Both were left for a Member of Congress on a public answering machine intended to receive constituent petitions. Indictment ¶¶ 6, 10. A constituent telling his elected representative what he "support[s]" and what he intends to "advocat[e]" is engaged in

the most traditional political act there is: lobbying. *Cf. White*, 670 F.3d at 513; *Fenton*, 30 F. Supp. 2d at 530.

## II. THE FIRST AMENDMENT REQUIRES DISMISSAL NOW.

### A. Americans have always taken their angriest grievances to their representatives—often in violent terms.

The right to carry grievances to those in power is older than the Republic. It "traces its origins to Magna Carta," and the Declaration of Independence "arose in the same tradition," complaining that "[o]ur repeated Petitions have been answered only by repeated injury." *Guarnieri*, 564 U.S. at 395–96 (quoting The Declaration of Independence (U.S. 1776)). Petitions "assume an added dimension when they seek to advance political, social, or other ideas of interest to the community as a whole." *Id.* at 395. The darkest chapter in Congress's treatment of petitions—the House "gag rule" that automatically tabled antislavery petitions from 1836 to 1844—is remembered as John Quincy Adams denounced it: "a direct violation of the Constitution of the United States."[14]

Violent rhetoric has always been part of that tradition. Patrick Henry is remembered for warning the House of Burgesses that "Caesar had his Brutus—Charles the first, his Cromwell—and George the third . . . may profit by their example."[15] Jefferson wrote that "[t]he tree of liberty must be refreshed from time to time with the blood of patriots and tyrants."[16] Lincoln, in his First Inaugural Address, acknowledged the people's "*revolutionary* right to dismember or overthrow" a

---

14 *See The House "Gag Rule,"* History, Art & Archives, U.S. House of Representatives.

15 George Ford Smith, *A Firebrand Scorches Colonial Virginia,* Mises Institute (Sep. 7, 2026); William Wirt, *Sketches of the Life and Character of Patrick Henry* (1817).

16 Letter from Thomas Jefferson to William Stephens Smith (Nov. 13, 1787).

government they had grown weary of.[17] The closest precedent was spoken in this city. In August 1852, addressing the Free Soil Party's national convention in Pittsburgh, Frederick Douglass declared that "[t]he only way to make the Fugitive Slave Law a dead letter is to make half a dozen or more dead kidnappers."[18] The audience laughed and applauded. *Id.* Two years later, after a guard deputized by the United States Marshal was killed in an attempt to free a fugitive from a Boston courthouse, Douglass wrote that the guard "had forfeited his right to live."[19] No one prosecuted Douglass. Mr. Chandler is no Douglass, and immigration enforcement is not slavery. But the First Amendment does not protect advocacy only when history later vindicates the cause or the speaker. American political vocabulary has always included tyrants, blood, revolution, and the deaths of those in power.

It still does. In November 2025, after six Members of Congress, two of them Pennsylvanians, released a video urging service members to refuse unlawful orders, the President posted that their conduct was "SEDITIOUS BEHAVIOR, punishable by DEATH!" and shared

---

17 Abraham Lincoln, *First Inaugural Address* (Mar. 4, 1861) (emphasis in original).

18 Frederick Douglass, *Let All Soil Be Free Soil: An Address Delivered in Pittsburgh, Pennsylvania, on 11 August 1852*, Frederick Douglass Papers Project; *see also* 2 Philip S. Foner, *The Life and Writings of Frederick Douglass* 206–09 (1950). Douglass delivered the address during the national convention of the Free Democratic (Free Soil) Party.

19 Frederick Douglass, *Is It Right and Wise to Kill a Kidnapper?*, Frederick Douglass' Paper, at 2 (June 2, 1854) ("We hold that he had forfeited his right to live, and that his death was necessary, as a warning to others liable to pursue a like course."); *see* Earl Maltz, *The Trial of Anthony Burns (1854)*, Encyclopedia Virginia (Dec. 7, 2020) (describing the May 26, 1854 attack on the Boston courthouse that resulted "in the death of James Batchelder, a temporary deputy U.S. marshal").

a post declaring "HANG THEM GEORGE WASHINGTON WOULD !!"[20] A year earlier, the President said of a former Congresswoman: "Let's put her with a rifle standing there with nine barrels shooting at her, OK? Let's see how she feels about it. You know, when the guns are trained on her face."[21] Before returning to office, the President wrote that a sitting Senator "has a DEATH WISH," and that the Chairman of the Joint Chiefs had committed "an act so egregious that, in times gone by, the punishment would have been DEATH!"[22] He told a rally in Lititz, Pennsylvania, that anyone trying to shoot him "would have to shoot through the fake news. And I don't mind that so much."[23] He told another crowd to "knock the crap out of" protesters, promising, "I will pay for the legal fees."[24] In Erie, in this District, he said "one rough hour—and I mean real rough" of policing would end retail theft.[25]

---

[20] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 20, 2025); *see* Ana Faguy & Brandon Drenon, *Trump Says He Was 'Not Threatening Death' to Democrats over Video to Troops*, BBC News (Nov. 21, 2025).

[21] *See* Sam Cabral, *Trump Says Cheney Wouldn't Be 'War Hawk' if 'Guns Are Trained on Her'*, BBC News (Nov. 1, 2024).

[22] Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 30, 2022, 6:49 PM) (Sen. Mitch McConnell); Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 22, 2023, 7:59 PM) (Gen. Mark Milley); *see* Eric Bradner, *Trump Launches Direct Attack on McConnell a Month Out from Midterm Elections*, CNN (Oct. 1, 2022); Aliza Chasan, *Gen. Milley Says He Has "Appropriate" Safety Measures After Trump Social Media Threat*, CBS News (Sept. 27, 2023).

[23] *Trump Says "I Don't Mind" if Someone Had to Shoot Through Media*, CBS News (Nov. 3, 2024); *see also* Steve Holland, *Trump Says He Wouldn't Mind if Someone Shot Through 'the Fake News' to Get Him*, Reuters (Nov. 3, 2024).

[24] Camila Domonoske, *Trump on Rally Violence: 'Don't Accept Responsibility,' Might Pay Legal Bills*, NPR (Mar. 13, 2016); Colin Campbell, *Donald Trump: 'Knock the Crap Out of' Any Protesters About to Throw Tomatoes*, Bus. Insider (Feb. 1, 2016).

[25] Meg Kinnard, *Donald Trump Suggests 'One Rough Hour' of Policing Will End Theft*, AP News (Sept. 30, 2024).

Nor is the President alone. In 2025, an Arizona legislator posted that a sitting Member of Congress and those like her should be "tried convicted and hanged."[26] In 2022, an Arizona state senator urged supporters to "build more gallows" so that "high-level criminals" could be tried, convicted, and hanged.[27] Virginia's newly elected Attorney General once texted that the Speaker of the House of Delegates should get "two bullets to the head."[28] And the Senate's Democratic leader stood outside the Supreme Court and told two Justices by name that they had "released the whirlwind" and "will pay the price."[29]

Some of these speakers apologized for their harsh rhetoric in the face of public backlash.[30] But none was prosecuted, and rightly so. The First Amendment does not protect such words less when they come from a constituent and are aimed up the chain of power rather than down. As one

---

26 Jerod MacDonald-Evoy, *GOP Lawmaker Calls for Dem Congresswoman to Be Executed for Urging Trump Protests*, Ariz. Mirror (Sept. 25, 2025) (quoting Arizona State Representative John Gillette's post about U.S. Representative Pramila Jayapal); *see also* George Chidi, *Republican Arizona Lawmaker Makes Post Calling for Execution of Democratic Congresswoman*, Guardian (Sept. 26, 2025).

27 Ben Giles, *Arizona Senate Censures Wendy Rogers for Threats, Calls to Violence*, KJZZ (Mar. 1, 2022) (quoting Arizona State Senator Wendy Rogers: "If we try some of these high-level criminals, convict them and use a newly built set of gallows, it'll make an example of these traitors who have betrayed our country.").

28 Olivia Diaz, *Democrat Jay Jones Elected Virginia Attorney General Despite Texts Endorsing Violence*, AP News (Nov. 4, 2025).

29 Adam Liptak, *John Roberts Condemns Schumer for Saying Justices 'Will Pay the Price' for 'Awful Decisions'*, N.Y. Times (Mar. 4, 2020); Rebecca Shabad, *Schumer Denies Threatening Supreme Court Justices, but Says, 'I Shouldn't Have Used the Words I Did'*, NBC News (Mar. 5, 2020) (quoting Senator Schumer: "I want to tell you, Gorsuch. I want to tell you, Kavanaugh. You have released the whirlwind and you will pay the price.").

30 *See, e.g.*, Andrew Desiderio, *Schumer Walks Back SCOTUS Comments After Roberts Rebuke*, Politico (Mar. 5, 2020) (quoting Senator Schumer: "I should not have used the words I used yesterday."); Diaz, *supra* note 28 (Jones "apologized for the private messages").

court put it in dismissing a speech-based indictment, "[i]f prosecutors choose to tolerate the above grievances coming from the highest office in the land, then surely a . . . citizen should likewise be allowed to vent his grievances. Their complaints are cut from the same cloth." *United States v. Cook*, 472 F. Supp. 3d 326, 337 (N.D. Miss. 2020).

Mr. Chandler's particular rhetoric—the demand that officials be tried, convicted, and hanged for crimes of state—also has a pedigree. It is the demand of Nuremberg. Justice Jackson, a son of Pennsylvania, called the decision to submit the Nazi leaders to trial "one of the most significant tributes that Power has ever paid to Reason."[31] Mr. Chandler's version was crude where Jackson's was lofty. But the demand was the same: not vengeance, but judgment, for what Mr. Chandler viewed as crimes against the American public akin to Nazi war crimes.

**B. A trial would itself inflict the injury the First Amendment forbids.**

Juries resolve genuine disputes about what words mean. There is no such dispute here. The words are in the indictment, and so is much of the context. What remains is a question of law—one the Court has a "special responsibility" to answer. *Bose*, 466 U.S. at 505. Leaving it for trial would not be neutral. It would be punishment the First Amendment forbids. Mr. Chandler has been incarcerated for months as a result of these charges. He has lost his home, his savings, his campaign, and his freedom. He has been assaulted on at least one occasion while in custody.

The Supreme Court required not just a true threat but proof of the speaker's reckless mental state in *Counterman* precisely because threats prosecutions chill protected speech: "The speaker's fear of mistaking whether a statement is a threat; his fear of the legal system getting that judgment wrong; his fear, in any event, of incurring legal costs—all those may lead him to swallow

[31] Jackson, Opening Statement, *supra* note 12.

words that are in fact not true threats." *Counterman,* 600 U.S. at 78. That chill "may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." *Dombrowski*, 380 U.S. at 487. And the danger is sharpest for political speech. "Many of this Court's true-threats cases involve . . . charged political speech." *Counterman*, 600 U.S. at 88 (Sotomayor, J., concurring in part and concurring in the judgment). As Justice Sotomayor observed, the Court's "own cases show time and again how true-threats prosecutions sweep in political speech." *Id.* at 98. That is all the more reason for the Court to answer the threshold question itself.

Every day, congressional offices receive calls and messages from constituents who are furious about wars, elections, deportations, income inequality, and the politicians they hold responsible. Many of those messages use language no one would repeat in polite company. But all of it is part of the great American tradition of speaking fearlessly and defiantly toward those in power. If this indictment survives, every one of those callers must wonder whether the next voicemail will be the one that brings agents to the door. That is the chill the First Amendment forbids.

"Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and—as it did here—inflict great pain." *Snyder v. Phelps*, 562 U.S. 443, 460–61 (2011). But "[a]s a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.* at 461. Whatever the wisdom of his views, Mr. Chandler's voicemails were speech on public issues, delivered to a public official, by a constituent and candidate for public office. The Constitution protects them.

## CONCLUSION

Raymond Chandler's voicemails were provocative and crude. But they were also part of a long American tradition of aggressive political rhetoric and fearlessness in dissent from injustice. None was a true threat. The Court should dismiss the indictment with prejudice.

Respectfully submitted,

RAYMOND CHANDLER III

By counsel:

/s/ *Jake D. Morrison*
JAKE D. MORRISON
Assistant Federal Public Defender