IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAYMOND EUGENE CHANDLER III | Criminal No. 26-90 |

**GOVERNMENT'S OMNIBUS RESPONSE TO THE DEFENDANT'S PRETRIAL MOTIONS**

AND NOW comes the United States of America, by its attorneys, Troy Rivetti, United States Attorney for the Western District of Pennsylvania, and Brendan J. McKenna, Assistant United States Attorney for said District, and respectfully submits the prosecution's omnibus response to the Defendant's Motion to Dismiss Indictment (Doc. No. 35); Motion for Notice of Evidence Under Fed. R. Evid 404(b) and 609 (Doc. No. 36); and Motion to Preserve Law Enforcement's Rough Notes (Doc. No. 37).

In his Motion to Dismiss Indictment, defendant Raymond Eugene Chandler III ("Chandler") argues that the charged conduct is protected by the First Amendment because none of the statements are objectively threatening for purposes of alleging a "true threat." The Government respectfully opposes the Defendant's motion. The context and content of the statements are sufficient to establish that a reasonable jury could find the charged statements to be true threats. To the extent that the defense seeks to use this motion to challenge the sufficiency of the Government's evidence, those issues should be determined at trial.

As to the remaining motions, the Government has no objection to providing reasonable notice of evidence it seeks to introduce at trial under Fed. R. Evid. 404(b) and 609 or to the Court entering an order for law enforcement to preserve law enforcement's rough notes.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Criminal Complaint

Following the January 2025 inauguration of President Trump, Chandler began leaving voicemails for a Member of Congress, who is referred to both in the Criminal Complaint and Indictment as "Victim 1." On April 28, 2026, Victim 1's representatives provided audio recordings of Chandler's voicemails to the Federal Bureau of Investigation ("FBI"). As detailed in the Affidavit in Support of the Criminal Complaint, Chandler described (1) his purchase of a combat knife due to fear that his government would kill him; (2) his support for armed resistance against U.S. Immigration and Customs Enforcement ("ICE") along with his willingness to personally kill; (3) his belief that Victim 1 broke his covenant with God; (4) his intent to build gallows to hang Victim 1; and (5) his realization that violence had become necessary, along with a list of individuals who deserved death. Case No. 2:26-mj-00665-PLD, Doc. No. 3-1, ¶¶ 14.a-e. Count One of the Complaint charged Chandler with violating Title 18, United States Code, Sections 115(a)(1)(A) and 115(a)(1)(B) related to a threat to assault and murder a member of the immediate family of a U.S. Official and a U.S. Official on or about April 18, 2026.[1] Count Two of the Complaint charged Chandler with violating Title 18, United States Code, Section 115(a)(1)(B) related to his threat to assault and murder a U.S. Official on or about April 29, 2026.[2] On May 1, 2026, at 8:30 AM, U.S. Magistrate Judge Patricia L. Dodge issued the Criminal Complaint. Case No. 2:26-mj-00665-PLD, Doc. No. 3

### B. Arrest, Seizure, and Detention

Before executing the arrest of Chandler later that morning at his residence, he left another voicemail for Victim 1. In this voicemail, Chandler described a historical bombing committed by

[1] Count One of the Criminal Complaint is Count Four of the Indictment.
[2] Count Two of the Criminal Complaint is Count Five of the Indictment.

"thirteen socialists, anarchists" who he later described as "socialist heroes." *See* Doc. No. 19, ¶ 4.l. Chandler ended his call by stating, "I want you to think about them, and I want you to be terrified." *Id.*

In conjunction with his arrest, the FBI executed a federal search warrant upon Chandler's residence. The search resulted in the seizure of bladed weapons, some of which Chandler kept in a locked safe, and his handwritten written journal. Chandler included a table of contents for the journal with page numbers for the following entries: "A Radically Peaceful Plan To Kill All The Billionaires," "Processing The Issues I Have With ICE Agents," and "Things I Can Do To Stop ICE." In addition to brainstorming ways to kill ICE agents and drawing pictures of various deaths, Chandler's journal included the following statements:

> "I keep calling Congress telling them I want them to kill all the ICE agents and billionaires. I must sound insane to them and yet that is where my heart and head are really at."
>
> "I emotionally, politically, and intellectually support violence assaults on ICE agents. I actually support it. This is a very scary place to be."
> (Emphasis in original).
>
> "While I would not commit an act of violence against another, permitting it via a 'social pardon' is the closest I can get to such an act . . . [T]he hand that delivered that justice should be set free – after all, they are simply the instrument of God's wrath. Who am I to intervene?"

On May 8, 2026, Chandler appeared before U.S. Magistrate Judge Christopher B. Brown for his preliminary and detention hearings. Case No. 2:26-mj-00665-PLD, Doc. No. 16. At the hearings, the Government introduced excerpts from Chandler's journal, a photograph of a machete, a hatchet, and knives seized by the FBI, and an audio recording of Chandler's voicemail that immediately preceded his arrest on May 1, 2026. The Government also presented the testimony of FBI Special Agent Jason Furney, who detailed the investigation into Chandler, the circumstances surrounding his arrest, and the seizure of the journal and bladed weapons. Also

during his testimony, Agent Furney provided an approximate distance between Chandler's residence and Victim 1's residence within the Western District of Pennsylvania. At the close of the hearings, Judge Brown found probable cause supported the charged offenses (*id.*) and that the Government proved by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure the safety of any other person and the community. Case No. 2:26-mj-00665-PLD, Doc. No. 18 at 3. Chandler remains detained pending trial.

C. Indictment

On May 20, 2026, a federal grand jury sitting in the Western District of Pennsylvania returned the five-count Indictment against Chandler. Doc. No. 19. Counts One through Three and Five charge Chandler with Influencing, Impeding, or Retaliating Against a Federal Official or Federal Law Enforcement Officer by Threat, in violation of 18 U.S.C. §§ 115(a)(1)(B) and 115(b)(4). Count Four charges Chandler with Influencing, Impeding, or Retaliating Against a Federal Official or Federal Law Enforcement Officer by Threat, in violation of 18 U.S.C. §§ 115(a)(1)(A), 115(a)(1)(B), and 115(b)(4).[3] Each count arises from a voicemail Chandler left for Victim 1, which is quoted in the Indictment. The quoted speech in each count follows:

> Count One: "Now, let me be clear. I don't just support the armed . . . the targeted murder and assassination of ICE agents anymore. I was already there. I now support armed resistance against ICE. If they're killing mothers of children who are just going about their day, they deserve death. There's no legitimacy to their law enforcement whatsoever. They deserve death. All of them deserve death. Dismantle the organization, name and shame every single one of them, and then track them so that we can try them in a court of law and we can get justice for the people who have died at these monsters' hands. I, I support armed resistance against ICE. I want every agent dead. Everyone. I want anyone in charge of it dead. Everyone. I am willing to go to war. I am willing to personally kill. If you are willing to arm me, let's go to war. Fuck, ICE. Fuck anyone who supports ICE. Death to them all. Help me bring it to them."

> Count Two: "I'm a Quaker. I'm a Christian. I practice non-violence and

[3] In addition to alleging a threat to assault and murder a U.S. Official, Count Four alleges a threat to assault and murder a member of the immediate family of a U.S. Official.

peaceful testimonies. Um, I'm also antifascist, just like my grandfather who built the gallows that hung Nazi war, war criminals after World War II. You could say killing Nazis comes in my family's history. I am Antifa through and through. I'm an antifascist. It is in my blood. It was in my grandfather's blood and in his father's blood. This is the nature of being an American. We fought a whole world war over this. So, I'm gonna make it really clear to ya. I am publicly Antifa. I am an antifascist. I believe that you are evil, and I believe that you; this kind of rhetoric is going to kill people. So how about you come and get me. Come and get me. Come and round me up for being a terrorist since the President has decided that my speech counts as terrorism. Okay, come and round me up. Put me in your fucking concentration camp so that way I can come out when I'm done and build the gallows and come and hang you. Get this President out of office today. This is un-American. It's un-Christian. It's fucking evil. Get him out."

Count Three: "I woke up this morning realizing that violence has become necessary. I'm going to start organizing armed resistance against ICE. I'm going to start advocating for people to kill them. I'm going to start releasing information publicly. Not on the internet. Not in a way that could be censored. But just with postcards and posters, calling for people to kill ICE agents. I'm going to send out postcards to folks who . . . have restaurants to teach them how to cultivate salmonella and campylobacter so that these ICE agents can never eat in a public restaurant again out of pure fear that they might leave with food poisoning, and indeed, a large majority of them are going to start experiencing food poisoning. I'm going to build a facial recognition app that identifies these agents and bans them from businesses that businesses can opt into freely. These agents will go through the rest of their lives as pariahs. They will be banned from their own communities, and I'm going to dedicate the next twenty years of my life to making sure of it. (ICE agent, whose identity is known to the grand jury) deserves death. (U.S. Border Patrol officer, whose identity is known to the grand jury) deserves death. (U.S. Official, whose identity is known to the grand jury) deserves death. Donald Trump deserves death . . . Nothing short of death will bring justice, and without justice there will never be peace. You started attacking American citizens, you started killing people, you . . . created death squads, and then you gave them immunity. Death to anyone involved. Death to anyone who advocates for that. Death to them all."

Count Four: "Sir, I have, uh, I'm calling this morning 'cause I want you to imagine a scenario. I want you to imagine a scenario where all the 1200 billionaires in this country, all their properties are surrounded simultaneously by a thousand people. So, imagine your house, your daughter's house, everyone you know and love who is also rich. Imagine every single one of those homes being surrounded by a thousand people. Then imagine them all getting a text and then, then suddenly taking out their pocket knives, walking slowly towards your house with 10, you got your 10 guards or whatever against a thousand people, and then they come and they pull you out of your house, and they slit

> your throat, and they slit your daughter's throat, and they slit everyone's throat. That you know, sir, that is the future. It's not a future I want, it's not a future I'm advocating for, but wealth concentration has gotten so bad in this country. The greed has gotten so bad. People are suffering so much, sir, that that is what is in our future. You will not escape their wrath. We must redistribute the wealth away from people like you."
>
> Count Five: "You've probably getting quite used to my voice. Sir, I'm calling this evening because what I want you to do is, I want you to take a firearm. I want you to put it in your hand. I want you to walk into the Oval Office. I want you to put that firearm to the President's head, and I want you to pull the trigger and I want you to kill him. I am petitioning you, Senator for redress of grievances. My redress of grievances is that this president is awful . . . He's a liar among all liars. He's a great deceiver. He's the antichrist. I want you to walk into the Oval Office with a gun in your hand. I want you to put it to his temple, and I want you to pull the trigger. That is what I want you to do as my agent. That's what I want you to do as my elected official. That's what I am petitioning you to do with my free speech. I want you to kill the President. I want you to assassinate the President. That's what I want you to do. Now, Senator, are you gonna come after me? Are you going to try me because of my voice and what I said?"

In addition to the five-counts, the Indictment contains a General Allegations section that quotes additional voicemails that Chandler left for Victim 1. In these voicemails, as summarized in the Indictment, Chandler "advocated for various acts of violence against U.S. Officials, their families, ICE agents, and the wealthy; shared his plan to publish personal identifiable information of ICE agents; accused U.S. Officials of violating their covenants with God or otherwise inciting God's anger; implied knowing where Members of Congress lived; and described his purchase of bladed weapons and willingness to personally kill." Doc. No. 19, ¶ 4.

## II. RESPONSE TO MOTION TO DISMISS INDICTMENT UNDER THE FIRST AMENDMENT FOR LACK OF A TRUE THREAT (Doc. No. 35)

Defendant Chandler moves to dismiss the Indictment under Fed. R. Crim. P. 12(b). Chandler argues that his statements, while sometimes "shocking" or "crude," were not true threats. Doc. No. 35 at 8. According to the Defendant, his speech was protected under the First Amendment as "advocacy" (Counts One and Three), "a [t]hreat conditioned on" government

action (Count Two), "a prediction of a grim future" (Count Four), and "a protest" (Count Five). Doc. No. 35 at 9-10.

Comingling threats with politics, distorted judicial procedure, or advocating for others to commit violence does not render the Defendant's conduct constitutionally protected. When properly read in context – to include a yearlong crusade of frequent phone calls in which the Defendant advocated for horrific acts of violence against U.S. Officials, the daughter of a U.S. Official, and law enforcement officers; described both his willingness to personally kill and his purchase of a bladed weapon; accused U.S. Officials of violating covenants with God or otherwise inciting His anger; implied knowing where Members of Congress lived; and defined his purpose as wanting the recipient of his speech "terrified" – a reasonable jury could find the charged statements objectively threatening. The First Amendment simply does not insulate such speech from prosecution, and the Motion to Dismiss must be denied.

A. Applicable Law

1. *True Threats*

"'From 1791 to the present, . . . our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas,' including obscenity, defamation, and fighting words." *United States v. Davitashvil*, 97 F.4th 104, 109 (3d Cir. 2024) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992)). "True threats of violence constitute one such historically unprotected category of communications." *Id.* (quoting *Counterman v. Colorado*, 600 U.S. 66, 74 (2023)) (internal quotations omitted).

In a "true threat" prosecution, the United States must prove both an objective and subjective element. *United States v. Elonis*, 841 F.3d 589, 596 (3d Cir. 2016). As to the objective element, the United States must prove that "the defendant transmitted a communication that a reasonable

person would view as a threat." *Id.* As to the subjective element, the United States must prove that "the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman v. Colorado*, 600 U.S. 66, 69 (2023).[4] The United States does not need to prove that the defendant "actually intend[ed] to carry out the threat." *Virginia v. Black*, 538 U.S. 343, 359–60 (2003).

In *Counterman v. Colorado*, the Supreme Court reiterated that "true threats" are "'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" 600 U.S. at 74 (quoting *Black*, 538 U.S. at 359). "The 'true' in that term distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow[.]" *Id.* (quoting *Watts v. United States*, 394 U.S. 705, 708 (1969)). "The existence of a threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end." *Id.* (quoting *Elonis v. United States*, 575 U.S. 723, 733 (2015)). Indeed, the "reaction of the listeners" is one factor to be considered when determining whether a statement, when '[t]aken in context,' is a true threat. *Watts*, 394 U.S. at 708.

In other words, context is king when evaluating whether a communication is objectively threatening. In *United States v. Watts*, for example, the defendant was charged related to threatening the life of the President of the United States. 394 U.S. at 705-06. During a public rally, Watts joined a small discussion group to discuss police brutality. *Id.* at 706. While in the discussion group, Watts stated the following:

> They always holler at us to get an education. And now I have already received

---

[4] In the instant case, the United States must also prove the defendant threatened to assault or murder a United States official, a member of the immediate family of a United States official, or federal law enforcement officer;

a. with the intent to impede, intimidate, or interfere with such United States official or agent while engaged in the performance of official duties, or

b. with intent to retaliate against such United States official or agent on account of the performance of official duties.

18 U.S.C. §§ 115(a)(1)(A) and 115(a)(1)(B).

> my draft classification as 1—A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. They are not going to make me kill my black brothers.

*Id.* at 706. Following this statement, both Watts and the crowd laughed. *Id.* at 707. The Supreme Court held that Watts did not issue a threat, but rather engaged in "a kind of very crude offensive method of stating a political opposition to the President." *Id.* at 708. The Supreme Court determined, "Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise." *Id.*

Importantly, the fact that a threatening statement is accompanied by political or religious rhetoric does not mean the threat is constitutionally protected speech. *See Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 52 (2d Cir. 2016) (statements that people in government deserved to die, and identifying airplanes as targets, were not simply "off-the-cuff political hyperbole written in the context of friendly social media banter"); *United States v. Castillo*, 564 F. App'x 500, 504 (11th Cir. 2014) ("Unlike in *Watts*, there was no evidence that anyone had laughed in response to Castillo's post, and, instead, people interpreted it as a legitimate threat to the President, as evidenced by [the] decision to report the post to the Secret Service."); *United States v. Gregg*, 226 F.3d 253, 267-68 (3d Cir. 2000) ("Activities that injure, threaten, or obstruct are not protected by the First Amendment, whether or not such conduct communicates a message."); *United States v. Viefhaus*, 168 F.3d 392, 396 (10th Cir. 1999) ("Although the bulk of the recorded message at issue is comprised of crude political rhetoric, Viefhaus crossed the threshold from political rhetoric to criminal threat when he stated unequivocally that fifteen cities would be bombed."); *United States v. Daughenbaugh*, 49 F.3d 171, 174 (5th Cir. 1995) ("The political rhetoric accompanying the threats furnishes no constitutional shield."); *United States v. Bellrichard*, 994 F.2d 1318, 1322 (8th Cir. 1993) ("[A] person may not escape prosecution for uttering threatening language merely by

combining the threatening language with [mention of] issues of public concern."); *United States v. Callahan*, 702 F.2d 964, 966 (11th Cir. 1983) ("That the letter contains certain political and religious statements does not serve to remove it from the prohibition of the statute."); *United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999) (holding that "the fact that his speech or conduct was 'religious' does not immunize him from prosecution under generally-applicable criminal statutes").

Similarly, comingling a threatening statement with certain qualifying language will not preclude a finding that the communication was a true threat. For example, a speaker cannot mask a threat to commit an unlawful act of violence under the guise of seeking "justice." *United States v. Kelner*, 534 F.2d 1020, 1024 (2d. Cir. 1976) (rejecting defendant's political hyperbole argument and holding "where the threat is made in the midst of what may be other protected political expression, such as appellant's reference to 'justice' and 'equal rights under the law,' the threat itself may affront such important social interests that it is punishable absent proof of a specific intent to carry it into action[.]").

Further still, individuals cannot escape prosecution for issuing true threats simply because the threatened conduct is contingent on an event. *United States v. Christenson*, 653 F.3d 697, 701 (8th Cir. 2011) ("[N]o particular formulation of words is required to state a true threat. . . . [A] threat may be considered a 'true threat' even if it is premised on a contingency."); *Callahan*, 702 F.2d at 966 ("Although the carrying out of the threat might have been conditional upon Secret Service aid and agreement, the threat itself was not."); *Viefhaus*, 168 F.3d at 396 ("[A] statement may constitute a threat even though it is subject to a possible contingency in the maker's control.") (quotation marks omitted); *see also United States v. Turner*, 720 F.3d 411, 425 (2d Cir. 2013) ("This argument, however, again relies overmuch on the literal denotation and syntax of Turner's

statements, refusing to acknowledge that threats—which may be prohibited, consistent with the First Amendment—need be neither explicit nor conveyed with the grammatical precision of an Oxford don. Turner's conduct was reasonably found by the juryto [sic] constitute a threat, unprotected by the First Amendment; it need not also constitute incitement to imminent lawless action to be properly proscribed.").

Nor can an individual hide behind the First Amendment by vocalizing a desire for violence to befall someone or for another to commit such an act in his place. *United States v. Stock*, 728 F.3d 287, 301 (3rd Cir. 2013) ("[Defendant] has offered no reason, and we can think of none, why a wish could not constitute a threat in the right context."); *Viefhaus*, 168 F.3d at 396 ("There is no requirement that the defendant convey an intent to carry out the threatened conduct himself.") (citing *United States v. Dinwiddie*, 76 F.3d 913, 925 n. 9 (8th Cir. 1996)); *United States v. Stevens*, 881 F.3d 1249, 1253-54 (10th Cir. 2018) ("As to a message's language, we have warned against 'rigid adherence to the literal meaning of a communication without regard to its reasonable connotations[.]' . . . For example, '[a] defendant cannot escape potential liability simply by using the passive voice or couching a threat in terms of 'someone' committing an act of violence…"); *United States v. Wheeler*, 776 F.3d 736, 745 (10th Cir. 2015) ("Exhorting groups of followers to kill specific individuals can produce fear in a recipient no less than more traditional forms of threats. Allowing defendants to seek refuge in the First Amendment simply by phrasing threats as exhortations would . . . leave the state powerless against the ingenuity of threateners . . . We cannot endorse so wooden an interpretation of the term 'threat.'") (internal citation and quotation marks omitted).

Historically, courts had found that *some* threats that are communicated indirectly are less likely to be true threats than those communicated directly to the victim. *See, e.g.*, *Bellrichard*, 994

F.2d at 1321-22 ("As a general proposition, correspondence of this sort delivered to a person at home or at work is somewhat more likely to be taken by the recipient as a threat than is an oral statement made at a public gathering"). More recently, however, courts have found a true threat even if the statement was not made directly to its intended target, but instead to a third party, or even to a mass audience. *See United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002) (finding that a jury could conclude that statements were true threats against the Presi2dent though they were never delivered to him, any of his aides or any federal agencies); *United States v. Vartanian*, 245 F.3d 609, 615 (6th Cir. 2001) ("The fact that a threat or act of intimidation was not addressed directly to the protected individual does not mean that those words or conduct cannot or will not have the effect desired by the defendant."); *United States v. Myers*, 104 F.3d 76, 77-78 (5th Cir. 1997) (finding that threats made by defendant against the Veterans Administration and Congress during a telephone call to an employee of the Paralyzed Veterans of America were true threats).

2. *Motion to Dismiss Charged True Threats*

Pursuant to Rule 7 of the Federal Rules of Criminal Procedure,

> The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government. It need not contain a formal introduction or conclusion. A count may incorporate by reference an allegation made in another count. A count may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means. For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.

Fed. R. Crim. P. 7(c)(1)*; see also United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005). In the Third Circuit, "[a]n indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charge on the merits." *Stock*, 728 F.3d at 292 (quoting *United States v. Huet*, 665 F.3d 588, 594-95 (3d Cir. 2012)) (omitting original emphasis). An

indictment is sufficient if, when considered in its entirety, the indictment adequately informs the defendant of the charges against him so that he can prepare a defense and invoke the double jeopardy clause, when appropriate. *Urban*, 404 F.3d at 771.

A sufficient indictment "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *Stock*, 728 F.3d at 292 (quoting *Huet,* 665 F.3d at 595).

Fed. R. Crim. P. 12(b)(1) provides that a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." In considering a motion to dismiss an indictment under Rule 12, "the Court's review is confined to the facts alleged in the indictment." *Unted States v. Miah*, 546 F.Supp.3d 407, 418 (W.D. Pa. 2021) (Hardy, J.) (citing *United States v. Bergrin*, 650 F.3d 257, 268 (3d Cir. 2011)). "In evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual *allegations* set forth in the indictment." *Stock*, 728 F.3d at 299 (quoting *Huet*, 665 F.3d at 595) (emphasis added in *Stock*).

Significantly here, Chandler has not moved to dismiss the Indictment based on an alleged defect in the Indictment. Rather, he asserts that the speech charged in Counts One through Five does not rise to the level of true threats and thus is protected speech under the First Amendment. "'[W]hether a statement constitutes a [true] threat . . . is based on the context and totality of the communication,' which means the indictment must include sufficient context for the District Court 'to determine that a reasonable jury could find that [the charged] statement expressed an intent to injure in the present or future.'" *United States v. Miah*, 120 F.4th 99, 107 (3d Cir. 2024) (quoting *Stock*, 728 F.3d at 301).

"In the **usual** case, whether a communication constitutes a threat or a true threat 'is a matter

to be decided by the trier of fact.'" *Stock*, 728 F.3d at 298 (quoting *United States v. Kosma*, 951 F.2d 549, 555 (3d Cir. 1991) (emphasis added); *accord Wheeler*, 776 F.3d at 742 ("[A]bsent an unusual set of facts, the question whether statements amount to true threats is a question generally best left to a jury"); *United States v. Malik*, 16 F.3d 45, 51 (2d Cir. 1994); *United States v. Syring*, 522 F. Supp. 2d 125, 131 (D.D.C. 2007) ("[W]hether words used are a true threat is generally best left to the triers of fact"). However, "[a] few cases may be so clear . . . that they can be resolved as a matter of law." *Stock*, 728 F.3d at 298 (quoting *Kosma*, 951 F.2d at 555). "Accordingly, the Third Circuit reaffirmed in *Stock* that a court 'may properly dismiss an indictment as a matter of law if it concludes that no reasonable jury could find that the alleged communication constitutes a threat or a true threat.'" *Miah*, 546 F.Supp.3d at 410 (quoting *Stock*, 728 F.3d at 298).

B. <u>Argument</u>

Chandler's attempt to wrap himself in the American flag while extolling his First Amendment right to free speech is misguided and ignores evidence presented at his preliminary and detention hearings, including the short distance between Chandler's residence and Victim 1's within this District.[5] The Defendant goes so far as to argue that "the government has pled a political campaign conducted by telephone." Doc. No. 35 at 26. The attempt to frame Chandler's criminal conduct as part of a political campaign is absurd. He did not make these statements at a political rally or on a debate stage. Chandler engaged in a crusade of nearly daily calls to Victim 1 in which he advocated for horrific acts of violence against U.S. Officials, the daughter of a U.S. Official, and law enforcement. When the content of his voicemails reflected an escalation in violence to be visited upon others, Victim 1's representatives provided the voicemails to the FBI.

---

[5] The Indictment includes in its General Allegation section a description of a recorded call from Chandler to Victim 1 in which Chandler referred to himself as "your neighbor[.]" Doc. No. 19, ¶ 4.h. Despite having heard evidence of the relative short distance between the respective residences at the hearings, the defense motion attempts to explain Chandler's use of "your neighbor" as "an ordinary way for a constituent to describe himself." Doc. No. 35 at 25.

Three days later, the FBI charged Chandler by criminal complaint and executed a search warrant upon his residence, which resulted in the seizure of bladed weapons that Chandler secured in a safe and his journal. His journal is incredibly concerning and details the mind of a deeply troubled individual who sought to instill fear and desired death. The Government sought Chandler's detention because of the danger he poses, and he is properly detained pending trial.

This is not one of the "few cases" that are "so clear" as to whether the charged true threats are protected speech that this Honorable Court can resolve the Motion to Dismiss "as a matter of law." *Stock*, 728 F.3d at 298 (quoting *Kosma*, 951 F.2d at 555). The merits of Chandler's motion depend, among other things, on the full context and totality of his speech, the reaction of his audience, and other factual considerations that the parties will dispute at trial. "[T]he Government is not required to set forth its entire case in the indictment[.]" *Id.* at 301 (quoting *Huet*, 665 F.3d at 595). It did not do so here. Nevertheless, accepting the allegations set forth in the Indictment as true, as the Court must in considering the Motion to Dismiss (*id*. at 299), a reasonable jury could find that the communications constitute true threats. The Court must, therefore, deny the motion.

1. *The Charged Counts Include Political Rhetoric and are Objectively Threatening*

Chandler's motion argues that the charged counts do not rise to the level of true threats because they are not objectively threatening.[6] Rather, the Defendant submits that the statements

---

[6] In his Motion to Dismiss, Chandler does not challenge whether a jury could find that he acted recklessly. Nor should he given the state of the evidence regarding his subjective intent. Instead, the defense argues that *Counterman*'s holding, which governs the standard of proof related to the subjective intent element in a true threat prosecution, cannot be used as proof that the charged speech was objectively threatening. *See* Doc. No. 35 at 21-22. Not so. The finder of fact must look to the context and totality of the circumstances when determining whether a statement is objectively threatening. *See, e.g.*, *Castillo*, 564 F. App'x at 504 ("[A]lthough § 871(a) carries an objective standard, *see Callahan*, 702 F.2d at 966, we still may use evidence of the defendant's subjective intent in order to meet the objective standard—and indeed, we considered evidence of the defendant's subjective intent in *Callahan*, including that the defendant later emphasized that he meant what he had said initially."); *Stevens*, 881 F.3d at 1256 ("[W]e may consider the speaker's apparent intention or ability to carry out the threat in determining whether the communication was a true threat."). At trial, the jury may properly consider Chandler's intent, as documented in his journal, in determining whether his statements were objectively threatening.

are mere political hyperbole based upon the context of speech. He is wrong. "The appropriateness of such statements . . . must be viewed 'in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners.'" *Kosma*, 951 F.2d at 553-54 (quoting *Watts*, 394 U.S. at 708).

To be absolutely clear, this is not, as the defense argues, "*Watts* all over again." Doc. No. 35 at 31-32. *Watts* involved a single statement, which was expressly contingent upon an event, at a political rally that resulted in laughter by both the speaker and his audience. 394 U.S. at 706. That is entirely distinguishable from this case.

i. *The Content and Context of the Communications*

Unlike *Watts*, Chandler's communication was not given during a small group discussion at a political rally. He left voicemails for Victim 1. *United States v. Weiss*, 2021 WL 6116629, at *2 (9th Cir. 2021) (distinguishing true threat from protected speech, in part, on the basis that the defendant's "'message was "privately communicated"' to and "'personally targeted"' at Senator McConnell, rather than "'publicly distributed"' or addressed to a broader audience"); *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1086 (9th Cir. 2002), *as amended* (July 10, 2002) (observing that "a privately communicated threat is generally more likely to be taken seriously than a diffuse public one").

Also unlike *Watts*, Chandler's speech was not limited to a single statement. He engaged in a yearlong crusade of threatening speech with increasing calls for violence. Indeed, his charged threats were not made in a vacuum. The General Allegation section of the Indictment summarizes other calls: "In some voicemails, [he] advocated for various acts of violence against U.S. Officials, their families, ICE agents, and the wealthy; shared his plan to publish personal identifiable information of ICE agents; accused U.S. Officials of violating their covenants with God or

otherwise inciting God's anger; implied knowing where Members of Congress lived; and described his purchase of bladed weapons and willingness to personally kill." Doc. No. 19, ¶ 4. Those communications contextualize the charged threats in the Defendant's own words, which are quoted in the Indictment. Chandler described:

- being terrified that his government would kill him and purchasing a combat knife *id.*, ¶ 4.a);
- his support for armed resistance against ICE and willingness to personally kill (*id.*, ¶ 4.b);
- his support for attacks on police, his belief that Victim 1 broke his covenant with God, and his belief that the people will respond to violence with violence (*id.*, ¶ 4.c);
- Victim 1 as anti-Christian who brings shame on God and the country (*id.*, ¶ 4.d);
- his support for the targeted murder and assassination of ICE agents (*id.*, ¶ 4.e);
- ICE as biblically evil, his desire to see ICE agents hung, throats slit ear to ear, and gunned down in the street, and his belief that Victim 1 deserved death if he supported ICE (*id.*, ¶ 4.f);
- government conduct tantamount to the "highest evil ever quoted or thought of in the Bible" and an intent to string someone "up in a fucking tree" (*id.*, ¶ 4.g);
- himself as Victim 1's neighbor before clarifying an earlier voicemail about killing people (*id.*, ¶ 4.h);
- his desire to see Victim 1 place a black bag over the President's head, bind his hands, and deliver him to the enemy (*id.*, ¶ 4.i);
- his desire to see Victim 1 beg, his belief that Victim 1 was not protected, and his intent to hang Victim 1 (*id.*);

- his demand for Victim 1 to stop killing children, which Chandler believed God was counting, along with Victim 1's worship of money and his coming from money (*id.*, ¶ 4.j);
- Victim 1's support for genocide and war, along with his murder of children, in addition to an intent to hang Victim 1 himself "through the rule of law" (*id.*, ¶ 4.k); and
- a historical bombing committed by "thirteen socialists, anarchists," who he later described as "socialist heroes," along with Chandler's desire for Victim 1 "to be terrified." (*id.*, ¶ 4.l).

Chandler's praise for anarchists who committed a bombing, which occurred immediately preceding his arrest, merits brief discussion of *United States v. Voneida,* 337 F. App'x 246 (3d Cir. 2009). Like Chandler, the defendant in *Voneida* also celebrated a previous mass act of violence—in his case, the Virginia Tech shooter. He also made vague threats about future violence. He said: "Someday: I'll make the Virginia Tech incident look like a trip to an amusement park;" that he was "extatically [sic] happy" about the shooter, and that "the weary violent types who are sick of self-righteous, lecherous, arrogant and debauched attitudes displayed by [A]merican youth would band together with me for a day, and allow everyone at schools and universities across the nation to reap the bitter fruit of the seeds that they have been sowing for so long." *Id.* at 248. His threats were vague as to time, target, and matter. The Court of Appeals for the Third Circuit held that a rational jury could look at the context—namely, that Voneida's postings appeared just two days after the Virginia Tech shooting—to find the statements were a serious intention to inflict bodily harm. *Id.* at 248. It upheld his conviction under 18 U.S.C. § 875(c).

One month before *Voneida*, the Third Circuit considered a case under 18 U.S.C. § 115(a)(1)(B). The defendant in *United States v. D'Amario* sent a federal judge a "memorandum"

that warned that he was "extremely dangerous," that he "will not serve probation" or "take orders from federal judges and probation officers," that he would get a gun and violate his supervised release the day he is set free, and that it is "safer to revoke his supervision now . . . than to speculate on how this 'schizophrenic' who passionately hates NJ judges will react to sudden liberty." 330 F. App'x 409, 411–12 (3d Cir. 2009). D'Amario was convicted under Section 115(a)(1)(B). On appeal, he argued that his statements were sarcastic. After looking at the context surrounding D'Amario's statements, including the familiarity of the federal judge receiving the threat with D'Amario's criminal record and the judge's response to getting the threat, the Third Circuit rejected this argument. *Id*. at 413–14. The Third Circuit noted that it was up to the jury to decide whether D'Amario's memorandum was sarcastic or sincere. *Id*. at 414.

As stated, context is king when determining whether a communication constitutes a true threat. There is no requirement for particular words to communicate a true threat. For example, in *United States v. C.S.*, the defendant bandied about ideas for attacking the Washington Monument, local churches, or a random Christian family. 968 F.3d 237, 240–43 (3d Cir. 2020). He did not give a specific time or settle on a location for the attack. *Id*. Nevertheless, the Third Circuit found that his statements were true threats. "There is no rule that conditional statements, statements 'conveying a vague timeline or condition,' or even wishes can never be a true threat." *Id*. at 245 (quoting *Elonis*, 730 F.3d at 334). The Court examined the context behind the threats, including the defendant's collection of weaponry, the photos he posted of that weaponry, and his interest in violence and terrorism in holding that "a rational factfinder could find that a reasonable person would view C.S.'s statements as a serious expression of an intent to inflict injury." *Id*. The Third Circuit also used context—the defendant's internet searches, knowledge of ISIS vernacular, and possession of ISIS insignia—to hold that the defendant possessed the requisite subjective

intent. *Id.* at 246.

These Third Circuit cases, and the cases cited by Chandler, have two things in common. First, in none of these cases did the court look at the statements in a vacuum. They properly evaluated them in their full context, which has not yet been presented in this case. Second, the courts left the question of whether a statement was a threat, a witticism, or a political statement to a jury in all but the plainest cases. The context of Chandler's speech supports that a reasonable jury could find a true threat, and that question should be put to a jury.

Although Chandler left voicemails for a Member of Congress in which he voiced disagreements with policy and was, for a period of time, running for Congress himself, when viewed in context, a reasonable jury could find that the alleged communications constitute true threats. A true threat motivated by political views is still a true threat. *Daughenbaugh*, 49 F.3d at 174 ("The political rhetoric accompanying the threats furnishes no constitutional shield. Rather, the violent tone of the rhetoric amplifies the threats.") Chandler crossed the line from political advocacy to threats when he repeatedly left voicemails for Victim 1 that called for murder, assassination, and death of U.S. Officials and law enforcement; described his desire to personally kill and a purchase of a combat knife; alleged Victim 1 had broken his covenant with God; described both himself as Victim 1's neighbor and his willingness to hang Victim 1; told Victim 1 that he was not protected; and to wanting Victim 1 "terrified." His speech is all the more terrifying considering that he invoked God's anger, identified those who deserve death, to include Victim 1, ICE agents, and the President, and espoused future kangaroo judicial proceedings where he would serve as the hangman. *Bellrichard*, 994 F.2d at 1319–24 (holding that a number of letters warning their addressees that God or a third party would kill them were threats); *Kelner*, 534 F.2d at 1024 ( "Even where the threat is made in the midst of what may be other protected political

expression, such as appellant's reference to 'justice' and 'equal rights under the law,' the threat itself may affront such important social interests that it is punishable absent proof of a specific intent to carry it into action[.]").

All of the above contextualize the charged true threats, and a reasonable jury could find that Chandler "communicate[d] a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359. In summary, Chandler's charged threats, with relevant context,[7] include:

- Count One (April 18, 2025): "Now, let me be clear. I don't just support the armed . . . the targeted murder and assassination of ICE agents anymore. I was already there. I now support armed resistance against ICE. If they're killing mothers of children who are just going about their day, they deserve death. There's no legitimacy to their law enforcement whatsoever. They deserve death. All of them deserve death. Dismantle the organization, name and shame every single one of them, and then track them so that we can try them in a court of law and we can get justice for the people who have died at these monsters' hands. I, I support armed resistance against ICE. I want every agent dead. Everyone. I want anyone in charge of it dead. Everyone. I am willing to go to war. I am willing to personally kill. If you are willing to arm me, let's go to war. Fuck, ICE. Fuck anyone who supports ICE. Death to them all. Help me bring it to them."

In Count One, Chandler unequivocally communicated his willingness to go to war and to personally kill ICE agents. He even acknowledged his prior support of the targeted murder and assassination of ICE agents. Furthermore, on the same day Chandler issued this statement, he left a separate voicemail for Victim 1 in which he described being terrified that his government would kill him and to purchasing a combat knife. Doc. No. 19 at ¶ 4.a. The Indictment is replete with Chandler's other statements related to the violence he desired to be visited upon ICE agents, to include his desire to see ICE agents hung, throats slit ear to ear, and gunned down in the street. *See, e.g. id.*, ¶ 4.f.

[7] The below context excludes relevant portions of Chandler's journal as the Court is limited to the allegations contained in the Indictment when considering the Motion to Dismiss. *Stock*, 728 F.3d at 299.

Additionally, unlike *Watts*, where the speaker joked he would shoot the President if he were drafted and armed to fight in Vietnam, Chandler espoused his willingness to "go to war" and "to personally kill" so long as Victim 1 armed him. This is a critical distinction. In *Watts*, the defendant did not want to commit violence, whereas Chandler communicated that he did. *See, e.g., Kosma*, 951 F.2d at 554 ("Kosma's threats, though ostensibly phrased as "invitations," were not as conditional as those in *Watts*, which were dependent on the defendant's induction into the armed forces—a condition which the defendant stated would never happen. In contrast, Kosma specified the precise date, time and place for the President's '21 gun salute.'").

- Count Two (September 18, 2025): "I'm a Quaker. I'm a Christian. I practice non-violence and peaceful testimonies. Um, I'm also antifascist, just like my grandfather who built the gallows that hung Nazi war, war criminals after World War II. You could say killing Nazis comes in my family's history. I am Antifa through and through. I'm an antifascist. It is in my blood. It was in my grandfather's blood and in his father's blood. This is the nature of being an American. We fought a whole world war over this. So, I'm gonna make it really clear to ya. I am publicly Antifa. I am an antifascist. I believe that you are evil, and I believe that you; this kind of rhetoric is going to kill people. So how about you come and get me. Come and get me. Come and round me up for being a terrorist since the President has decided that my speech counts as terrorism. Okay, come and round me up. Put me in your fucking concentration camp so that way I can come out when I'm done and build the gallows and come and hang you. Get this President out of office today. This is un-American. It's un-Christian. It's fucking evil. Get him out."

In Count Two, Chandler communicated his intent to build gallows and hang Victim 1, who he described as evil. He did so after previously communicating a distrust of his government, a willingness to personally kill, and accusing Victim 1 of breaking his covenant with God. *Id.*, ¶¶ 4.b-c. Months later, Chandler later referred to himself as Victim 1's neighbor, which implied he knew where Victim 1 resided. *Id.*, ¶ 4.h. Further still, Chandler would later inform Victim 1 that he deserved death if he supported ICE (*id.*, ¶ 4.f.), that he desired to see Victim 1 beg (*id.*, ¶ 4.i.), that he did not believe Victim 1 was protected (*id.*), and that he intended to hang Victim 1 for "war

crimes" (*id.*). Indeed, Chandler threatened to hang Victim 1, or otherwise informed him that he deserved death, on numerous occasions, separate from Count Two. *Id.*, ¶¶ 4.f, i, k; 10, 12.

The fact that Chandler challenged Victim 1 to place him in a "fucking concentration camp" before he would build the gallows to hang Victim 1, when viewed in context, still communicates a serious intention to inflict bodily harm. "There is no rule that conditional statements, statements conveying a vague timeline or condition, or even wishes can never be a true threat." *C.S.*, 968 F.3d at 245 (quoting *Elonis*, 730 F.3d at 334). Further, and as discussed above in analyzing Count One, Chandler invited the condition that would precede the threatened violence. Unlike *Watts*, Chandler communicated his desire to commit violence and communicated it directly to his intended Victim.

- Count Three (January 12, 2026): "I woke up this morning realizing that violence has become necessary. I'm going to start organizing armed resistance against ICE. I'm going to start advocating for people to kill them. I'm going to start releasing information publicly. Not on the internet. Not in a way that could be censored. But just with postcards and posters, calling for people to kill ICE agents. I'm going to send out postcards to folks who . . . have restaurants to teach them how to cultivate salmonella and campylobacter so that these ICE agents can never eat in a public restaurant again out of pure fear that they might leave with food poisoning, and indeed, a large majority of them are going to start experiencing food poisoning. I'm going to build a facial recognition app that identifies these agents and bans them from businesses that businesses can opt into freely. These agents will go through the rest of their lives as pariahs. They will be banned from their own communities, and I'm going to dedicate the next twenty years of my life to making sure of it. . . . (describes teaching restaurants to poison agents) . . . (identifies U.S. Officials and agents who deserve death).

In Count Three, Chandler communicated his intent to advocate for others to kill ICE agents and to educate others on how to poison them after reaching the realization that violence was necessary. He went so far as to communicate his intent to publish information about ICE agents in a manner that would avoid censor and even identified specific law enforcement officials who he deemed worthy of death. Chandler made this statement after he unequivocally communicated his willingness to go to war and to personally kill ICE agents. *Id.*, ¶ 4.b. Again, the Indictment is replete with Chandler's other statements related to the violence he desired to be visited upon ICE

agents, to include his desire to see ICE agents hung, throats slit ear to ear, and gunned down in the street. *See, e.g. id.*, ¶ 4.f.

The fact that Chandler communicated his desire to have others commit an unlawful act of violence does not preclude a finding of true threat. *Viefhaus*, 168 F.3d at 396 ("There is no requirement that the defendant convey an intent to carry out the threatened conduct himself.") (citing *Dinwiddie*, 76 F.3d at 925 n. 9); *Wheeler*, 776 F.3d 736, 745 (10th Cir. 2015) ("Exhorting groups of followers to kill specific individuals can produce fear in a recipient no less than more traditional forms of threats.").

- <u>Count Four</u> (April 18, 2026): "I want you to imagine a scenario where all the 1,200 billionaires in this country, all their properties are surrounded simultaneously by a thousand people. So, imagine your house, your daughter's house, everyone you know and love who is also rich. Imagine every single one of those homes being surrounded by a thousand people. Then imagine them all getting a text and then, then suddenly taking out their pocket knives, walking slowly towards your house with 10, you got your 10 guards or whatever against a thousand people, and then they come and they pull you out of your house, and they slit your throat, and they slit your daughter's throat, and they slit everyone's throat. That you know, sir, that is the future. It's not a future I want, it's not a future I'm advocating for, but wealth concentration has gotten so bad in this country. The greed has gotten so bad. People are suffering so much, sir, that that is what is in our future. You will not escape their wrath. We must redistribute the wealth away from people like you."

In Count Four, Chandler asked Victim 1 to imagine he and his daughter being pulled from their home by a 1,000 people after his security detail is overrun and having their throats slit. Although Chandler attempts to undermine that he desires to see such violence ("it's not a future I want"), he goes on to state that Victim 1 "will not escape [the mob's] wrath." Moreover, Chandler communicated Count Four after previously describing his purchase of a combat knife due to a distrust of his government, a willingness to personally kill, and accusing Victim 1 of breaking his covenant with God. *Id.*, ¶¶ 4.a-c. Twelve days before communicating Count Four's "scenario," Chandler referred to himself as Victim 1's neighbor, which implied he knew where Victim 1 resided. *Id.*, ¶ 4.h. Further still, Chandler previously informed Victim 1 that he deserved death if

he supported ICE (*id.*, ¶ 4.f.), that he desired to see Victim 1 beg (*id.*, ¶ 4.i.), that he did not believe Victim 1 was protected (*id.*), and that he intended to hang Victim 1 for "war crimes" (*id.*). Indeed, Chandler threatened to hang Victim 1, or otherwise informed him that he deserved death, on numerous occasions, separate from Count Four. *Id.*, ¶¶ 4.f, i, k; 8, 10. Given this context, communicating the threat directly to Victim 1, and the vivid content of the speech alleged in Count Four, Chandler's "scenario" conveyed a serious intention to inflict bodily harm.

- Count Five (April 28, 2026): "You're probably getting quite used to my voice. Sir, I'm calling this evening because what I want you to do is, I want you to take a firearm. I want you to put it in your hand. I want you to walk into the Oval Office. I want you to put that firearm to the President's head, and I want you to pull the trigger and I want you to kill him. I am petitioning you, Senator for redress of grievances. My redress of grievances is that this president is awful . . . He's a liar among all liars. He's a great deceiver. He's the antichrist. I want you to walk into the Oval Office with a gun in your hand. I want you to put it to his temple, and I want you to pull the trigger. That is what I want you to do as my agent. That's what I want you to do as my elected official. That's what I am petitioning you to do with my free speech. I want you to kill the President. I want you to assassinate the President. That's what I want you to do. Now, Senator, are you gonna come after me? Are you going to try me because of my voice and what I said?"

In Count Five, Chandler unequivocally, and without any conditional language, directed Victim 1 to assassinate the President by shooting him in the head. Although this is the only charged threat involving the President, it was not the first time Chandler expressed his desire to see the President suffer a violent act. Indeed, the Indictment provides additional context. As alleged in the Indictment, Chandler communicated that the President deserved death on two prior occasions. *Id.* at ¶¶ 4.c, 10. In addition, about three weeks prior to issuing the charged threat, Chandler directed Victim 1 to "put a black bag over the President's [] head" and to "bind his hands" before "deliver[ing] him to the enemy." *Id.* at ¶ 4.i.

Furthermore, Chandler described the President in Count Five as "a great deceiver" and "the antichrist." This is particularly troubling given that Chandler invoked God in prior calls where he either advocated for violence or otherwise accused U.S. Officials and law enforcement of drawing

God's ire. *Id.*, ¶¶ 4.c-d, 4.g, 4.j. Mixing violent rhetoric with religious conviction is an incredibly dangerous combination that invokes fear in those who hear such speech. That is especially the case when, as here, the speaker oscillates between advocating for horrific acts of violence, as well as asserting his own personal willingness to kill, and describing himself as a Quaker, a Christian, and an individual who "practices non-violence and peaceful testimonies." *Id.*, ¶ 8. To the recipient of Chandler's speech, he would appear unhinged.

Unlike *Watts*, Chandler did not condition the shooting of the President on an event, nor did Chandler disavow that he desired violence. *See Kosma*, 951 F.2d at 554. On the contrary, Chandler communicated that he actually desired the assassination of the President. Further, Chandler seemingly acknowledged that he intended to cross the line between protected and unprotected speech by asking Victim 1 if he would "come after" and "try" him after directing the assassination. *See Castillo*, 564 F. App'x at 504 (considering the defendant's subjective intent when determining whether defendant's Facebook was objectively threatening).

The fact that Chandler communicated directly to Victim 1, rather than the President, does not preclude a finding that his speech was objectively threatening. *Taylor*, 720 F.3d at 424-25 (rejecting defense argument that language must be directed toward victims and not third parties). It certainly should not deprive the jury of the opportunity to weigh the evidence given the significant context surrounding Chandler's charged threats. *See, e.g., Hanna*, 293 F.3d at 1087-88. ("We conclude that the present case was properly submitted to the jury . . . There was extensive documentary evidence, in which Hanna stated or at least suggested that the President should be killed. Although Hanna did not explicitly indicate that he was going to kill the President, a jury could conclude that a reasonable person in Hanna's position would foresee that such statements would be perceived as threats by the recipients of the statements.").

Similarly, the Government need not prove in a true threat prosecution that the violence described by the speaker would occur. *Black*, 538 U.S. at 359–60; *Turner*, 720 F.3d at 425 ("Turner's conduct was reasonably found by the jury to constitute a threat, unprotected by the First Amendment; it need not also constitute incitement to imminent lawless action to be properly proscribed."); *Castillo*, 564 F. App'x at 504 ("[T]here is no requirement that Castillo actually intended to kill the President or even have intended to threaten him in order to sustain the conviction."). The focus is on what the speech conveyed to its recipient.

Given the content and frequency of Chandler's prior communications with Victim 1, to include a clear expression of an intent to kill over policy disagreements and advocating for the President's death, "[i]t would be natural for any person in such a circumstance to be fearful of future harm." *United States v. Zavrel*, 384 F.3d 130, 137 (3d Cri. 2004) (finding that "opening an envelope containing a white powder could not only create an apprehension of immediate fear and future harm, but also communicates to the intended victim the sender's hostility and the idea that the sender has access to a deadly agent that he or she can use again in the future.").

Of course, Chandler provides his own context in support of his Motion to Dismiss. He highlights that constituents may air grievances to their politicians, that the content of his speech includes matters of policy, that he was running for political office, and that there was no "concrete marker of real-world danger." Doc. No. 35 at 22-24. As stated, Chandler crossed the line in his political rhetoric, and the Government need not prove an intent to carry out the threat nor a firm plan to execute the violence. *Black*, 538 U.S. at 359–60; *C.S.*, 968 F.3d at 245 ("[T]he conditional nature of his statements and absence of definite plans do not foreclose a finding by a rational factfinder that the statements were objectively threats."). The frequency, vivid description, and direct manner in which Chandler issued his threats convey that he meant to commit an act of

unlawful violence. The focus is on the message he conveyed, not steps he could have taken to make good on the threats. *Counterman*, 600 U.S. at 74.

The defense also takes issue with the Indictment omitting the entirety of Chandler's calls related to exercising his right to free speech, his running for office, and his seeking death after prosecutions. Doc. No. 35 at 12. As an initial matter, the Indictment already includes this information as part of the General Allegations (Doc. No. 19 at ¶¶ 4.c, 4.g, 4.h, 4.i, 4.k.), as well as in Count Five ("That's what I am petitioning you to do with my free speech. I want you to kill the President). Thus, the context Chandler bemoans is absent from the Indictment is actually present, and the Court may consider that context in resolving the instant motion. In addition, the jury may consider the *complete* context of Chandler's speech and the totality of his conduct at trial. Setting that aside, there is no requirement for the Government to allege the entirety of the speech in each count. *Castillo*, 564 F. App'x at 504 ("Although the context of the post was relevant to determine whether Castillo's Facebook post constituted a true treat, [], there is no requirement that the government present the entire Facebook conversation to sustain Castillo's conviction. Thus, the district court did not plainly err by denying Castillo's Rule 29 motion based on the government's failure to admit the entire Facebook conversation.") (internal citation omitted).

ii. *The Reaction of the Listeners*

This is not, as Chandler asks the Court to believe, hyperbolic speech protected by the First Amendment. His speech was neither subtle nor implied. Given the above context, this speech communicated exactly what Chandler desired – to terrify with unambiguous threats to kill, hang, poison, slit throats, and shoot. *Weiss*, 2021 WL 6116629, at *2 (a threat is more likely to be believed when it describes "how the threat would be carried out") (citing *Black*, 538 U.S. at 360). Chandler's audience understood the serious nature of his communications, and the "reaction of the

listeners" is one factor to be considered when determining whether a statement, when '[t]aken in context,' is a true threat. *Watts*, 394 U.S. at 708.

To that end, unlike *Watts*, no one reacted with laughter at Chandler's speech. Quite the contrary, on the same day Chandler communicated the threat contained in Count Five (April 28, 2026), Victim 1's staff shared his voicemails with the FBI. Three days later, the FBI charged Chandler with a criminal complaint and executed a search warrant upon his residence to mitigate the threat that he posed to others. In addition to the above context, the reaction of Chandler's audience supports a finding that his communications qualified as true threats. *See Kosma*, 951 F.2d at 544 (quoting *United States v. Hoffman,* 806 F.2d 703, 712 (7th Cir.1986) ("The immediate response of the [White House] mail-room employee and the Secret Service to the content of [defendant's] letter is clear evidence of the seriousness the recipients of the letter attached to the expression of the intent to harm the President."), *cert. denied,* 481 U.S. 1005, 107 S.Ct. 1627, 95 L.Ed.2d 201 (1987)).

iii. *A Trial, Not Dismissal, Is Appropriate*

Chandler's Motion to Dismiss under Fed. R. Crim. P. 12(b)(3) is a poor vehicle to resolve whether the context of his communications supports that his speech qualifies as true threats. When deciding the Motion to Dismiss, this Court may not look outside the Indictment. *Stock*, 728 F.3d at 299. Nevertheless, the defense asks the Court to do precisely that. *See, e.g.* Doc. No 35 at 23 ("The voicemails respond, often within days, to national news—an ICE killing, a terrorism designation, a war, an indictment of a prominent critic of the President for alleged threats."). To be clear, the Government will further contextualize Chandler's speech through his journal and the proximity of his residence to Victim 1's at trial, which are matters not alleged in the Indictment. The complete context of the communications, therefore, requires the parties to present their

respective evidence at trial. This is one of the "usual case[s]" where the "trier of fact" should decide whether the communications qualify as true threats. *Stock*, 728 F.3d at 298 (quoting *Kosma*, 951 F.2d at 555).

The defense also argues that the First Amendment requires dismissal now, partly on the basis of historical and recent examples of rhetoric that was not prosecuted and the potential chilling of free speech. Doc. No. 35 at 37-42. That is not the correct standard to resolve the instant motion. "'[W]hether a statement constitutes a [true] threat . . . is based on the context and totality of the communication,' which means the indictment must include sufficient context for the District Court 'to determine that a reasonable jury could find that [the charged] statement expressed an intent to injure in the present or future.'" *United States v. Miah*, 120 F.4th 99, 107 (3d Cir. 2024) (quoting *Stock*, 728 F.3d at 301). The Government did so here, and the Motion to Dismiss must be denied.

## III. RESPONSE TO MOTION FOR REASONABLE NOTICE OF EVIDENCE THE GOVERNMENT INTENDS TO USE UNDER FEDERAL RULES OF EVIDENCE 404(B) AND 609 (Doc. No. 36)

Chandler next requests notice of Rule 404(b) and Rule 609 evidence at least thirty (30) days before trial, as well as a pretrial hearing on the admissibility of such evidence. (Doc. No. 36 at 1). The government has no objection to the entry of the requested order.

## IV. RESPONSE TO MOTION TO PRESERVE LAW ENFORCEMENT'S ROUGH NOTES (Doc. No. 37)

In his final motion, the defendant requests that the Court Order the preservation of law enforcement's rough notes and drafts of reports, as well as the production of said materials for the Court's inspection to determine whether they are discoverable. The government has no objection to the Court issuing such an Order and conducting the requested inspection.

Within the Third Circuit, "government agents must preserve rough notes of interviews with prospective trial witnesses." *United States v. Dudenhoefer*, 2025 WL 73355, at *3 (W.D. Pa. Jan.

10, 2025) (Baxter, J.) (citing *United States v. Ramos*, 27 F.3d 65, 66 (3d Cir. 1994); *United States v. Vella*, 562 F.2d 275 (3d Cir. 1977) (per curiam)). "In *United States v. Ammar* [], the Court of Appeals expanded the category of what must be retained to include rough reports; holding that 'the government must retain and, upon motion, make available to the district court both the rough notes and the drafts of reports of its agents to facilitate the district court's determination whether they should be produced.'" *United States v. James*, 2026 WL 693975, at *1 (W.D. Pa. March 12, 2026) (Horan, J.) (quoting *Ammar*, 714 F.2d 238, 259 (3d Cir. 1983)).

The purpose of the preservation is to enable "the trial court [to] determine whether the notes should be made available to the defendants under the Jencks Act or *Brady* rule." *United States v. Fleet Management Ltd.*, 2008 WL 1989958, at *4 (E.D. Pa. May 7, 2008) (citing *Ramos*, 27 F.3d at 68; *Vella*, 562 F.2d at 276).

In the event that rough notes are destroyed, courts within the Third Circuit examine the circumstances surrounding the destruction to determine whether suppression of evidence that was based upon the notes is warranted. *Id.* (citing *Ramos*, 27 F.3d at 69). However, "*Ramos* only demands the exclusion of evidence derived from destroyed rough notes when (1) the destruction was in bad faith, (2) the defendant raises a "colorable claim" that the notes contained either Jencks Act or *Brady* material, and (3) any excluded material has not been included in any formal interview report provided to the defendant." *Id.* (citing *Ramos*, 27 F.3d at 70-72).

Of note, Chandler need not concern himself with the possible destruction of rough notes or drafts. The FBI agents who conducted the investigation into him take their responsibilities seriously, and they already preserved those materials.

## V. <u>CONCLUSION</u>

WHEREFORE, based upon the foregoing, the government respectfully requests that the Court deny the Motion to Dismiss (Doc. No. 35) but has no objection to the relief requested in the Motion for Notice of Evidence Under Fed. R. Evid 404(b) and 609 (Doc. No. 36) and Motion to Preserve Law Enforcement's Rough Notes (Doc. No. 37).

Respectfully submitted,

TROY RIVETTI
United States Attorney

By: /s/ *Brendan J. McKenna*
BRENDAN J. McKENNA
Assistant U.S. Attorney
Joseph F. Weis, Jr. U.S. Courthouse
700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania 15219
(412) 894-7414 (Phone)
PA ID No. 314315